**Raymond James DORAN, V, a minor, by and through his parents and natural guardians, Rebecca Ann Doran and Raymond James Doran, III; and Rebecca Ann Doran and Raymond James Doran, III, Individually, Plaintiffs,**

v.

**Maurice F. PRIDDY, D.O., Defendant.**

**Civ. A. No. 79–1205.**

United States District Court, D. Kansas.

March 10, 1981.

Patrick J. Michaud, Michaud, Cordry & Michaud, Wichita, Kan., for plaintiffs.

C. Stanley Nelson, Hampton, Royce, Engleman & Nelson, Salina, Kan. and Alvin D. Herrington, McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, Kan., for defendant.

## ORDER ON APPELLATE REVIEW OF MAGISTRATE'S DISCOVERY ORDERS AND PLAINTIFFS' MOTION IN LIMINE

THEIS, District Judge.

This matter comes before the Court for decision on defendant's motions for review of certain decisions of the Magistrate, and plaintiffs' motion in limine.

This is a diversity action alleging the medical negligence of defendant between the dates of October 12 and October 15, 1977, inclusive, which caused permanent brain damage and other injuries to Raymond James Doran, V, or Chip, the minor plaintiff. The parents are also plaintiffs, seeking to recover past and future medical expenses.

The defense of Dr. Priddy is that causation of the infant plaintiff's claimed injuries stem from acts of so-called phantom parties who participated in the events of the infant plaintiff's life from immediately pre-natal to a post-natal period of considerable time duration. It is alleged that the injuries to the infant plaintiff were caused or contributed to by: (1) pre-natal negligent acts and finally the abortive act of Rebecca Ann Doran in rupturing the fetal membrane; (2) failure of Dr. Labhsetwar to undertake the care and treatment of Mrs. Doran at the time of the birth; (3) the negligent professional acts of Dr. Bollman, who undertook such care; (4) child abuse by the parents, Rebecca Ann and Raymond James Doran, III, during the post-natal period; and (5)

the statutory negligence of Dr. Luzier in failing to report information of physical child abuse a year after the infant plaintiff's birth.

Dr. Priddy was Mrs. Doran's doctor during her pregnancy. She was admitted to the hospital under his care on October 12, 1977. Her membrane had ruptured. Mrs. Doran had a cerclage suture in place, and the fetal age was estimated at thirty-two weeks. Labor was chemically suppressed. Dr. Priddy left town for the day on Saturday, October 15, 1977, to attend a football game. That morning Mrs. Doran was having strong contractions and had a low grade fever. Her condition appeared serious enough to a nurse, Mrs. Schweitzer, that she began looking for a doctor to see her. Dr. Labhsetwar was at the hospital at the time. She was the only board-certified obstetrician and gynecologist practicing in Junction City during the days in question. Dr. Priddy did not consult with Dr. Labhsetwar, but on Saturday Mrs. Schweitzer asked Dr. Labhsetwar for advice on how to proceed with Mrs. Doran. According to Dr. Labhsetwar, she suggested the nurse consult with Mrs. Doran about who she would like to have see her. Mrs. Doran had worked at the hospital and was acquainted with the staff. Mrs. Schweitzer called Dr. Bollman. No doctor was known to be covering for Dr. Priddy. After a discussion between Dr. Bollman and Mrs. Schweitzer about Mrs. Doran's condition, Dr. Bollman said because of the complicated nature of the problem he would just as soon defer to an obstetrician, and asked the nurse to call Dr. Labhsetwar before Dr. Bollman would decide to become involved. Although there is some dispute as to exactly why Dr. Labhsetwar declined to intervene, it is undisputed that she was never approached by either Mrs. Doran, Dr. Priddy, or anyone on her or his behalf. When Dr. Bollman learned Dr. Labhsetwar was not going to become involved, he undertook to see Mrs. Doran.

Dr. Bollman found an elevated white blood cell count, indicating possible infection. He could not tell how elevated, since no white blood cell counts had been taken in the previous three days Mrs. Doran was in the hospital. Dr. Bollman had Mrs. Doran taken to surgery, and performed a pelvic examination. He found foul-smelling material in the vagina, and confirmed that the membranes were ruptured. He removed the cerclage suture and then decided it would be necessary to perform a Caesarian section, feeling the infection indicated by the white blood count and the odor which was present, indicated it was urgent to deliver the child. He found a live baby, the minor plaintiff, and an abcess between the membrane and the uterine wall, which contained, by Dr. Bollman's estimate, 150 to 200 cubic centimeters of pus, as well as a foul smell. (Deposition of Dr. Bollman.) Chip, the minor plaintiff, weighed four pounds, six and a half ounces. The pathology report indicated, *inter alia*, acute inflammation of the membranes associated with the placenta, and of the umbilical cord, and acute inflammatory cell infiltrates within the vessel walls of the placenta. *Id.* at 33–34. It is alleged that Chip now suffers from sight, hearing, and motor problems, said to result from cerebral palsy arising out of professional negligence by Dr. Priddy.

Defendant appeals the action of the Magistrate in excluding from the pretrial order two issues of alleged comparative negligence. Defendant wishes to compare the negligence of Dr. Luzier and Dr. Labhsetwar. Dr. Thomas Luzier, a pediatrician, allegedly failed to comply with K.S.A. § 38–717, and report the suspected abuse of Chip to the Department of Social and Rehabilitative Services in October, 1978. Dr. Labhsetwar is a board-certified doctor of obstetrics and gynecology, who practices in Geary County. Dr. Priddy contends she was negligent because she did not deliver the child that Saturday afternoon when the nurse talked to her.

To compare the negligence of either of these doctors, if any there be, as contended by Dr. Priddy, would require the Court to create new causes of action under Kansas law. It seems ironic to find these causes of action urged by counsel for the Kansas

Health Care Stabilization Fund, whose legal employment stems from a studied and lobbied plan to reduce liability for Kansas health care providers.

There was no doctor-patient relationship between Dr. Labhsetwar and Mrs. Doran. Dr. Priddy urges this Court to create a new duty for a physician who has some knowledge of another doctor's patient, who has no personal knowledge of the treatment history, what arrangements that doctor has made, and who knows the other doctor is gone for the week-end, to assume responsibility for the patient without the patient's requesting that doctor to render care. The Court has examined the cases cited by the defendant, which hold that a hospital in an emergency, critical situation, cannot refuse care or hospitalization to a person. Mrs. Doran was a patient in a hospital, under a particular doctor's care. These cases have no application to these facts. Under the facts of this case, Dr. Labhsetwar was under no duty to act, and there is no negligence to compare.

Defendant further argues that under Kansas comparative negligence, causation should be compared of all possible causes of an injury, instead of merely comparing causation of negligent parties. Defendant argues this theory of causation is derived from *Kennedy v. City of Sawyer*, 4 Kan.App.2d 545, 608 P.2d 1379 (1980). The Kansas Supreme Court has since handed down its decision in *Sawyer*, and it speaks of the "degree of causation of the *respective tortfeasors*." *Kennedy v. City of Sawyer*, 228 Kan. 439, 462, 618 P.2d 788 (1980). (Emphasis supplied.) Since Dr. Labhsetwar is not a tortfeasor, her alleged "causation" will not be considered, even if by the stretch of someone's imagination some blame could be conjured.

The Court's attention has been directed to one California case which has determined that a private cause of action is created for a child by a statute requiring a professional to report physical injuries to children which appear to have been inflicted other than by accident. *Landeros v.*

*Flood*, 17 Cal.3d 399, 131 Cal.Rptr. 69, 551 P.2d 389 (1976). This seems a well reasoned case, and this Court would be inclined to follow it if it were necessary. On the facts of this case, however, it would be improper to compare any alleged negligence of Dr. Luzier in not reporting the alleged child abuse, with any negligence of Dr. Priddy. At issue in this case is the conduct of Dr. Priddy and others prior to and at the time of Chip's birth. Plaintiffs, to prevail, must prove by a preponderance of the evidence, that the reasonable medical probability is that Chip's injuries were caused by the events in that period as charged in their complaint.

An examination of the cases which have interpreted the Kansas comparative negligence statute makes it clear that the law has not changed as much as defendant urges. The statute itself refers to a party's *causal negligence* and the amount of the causal negligence attributed to all parties resulting in death, personal injury, or property damage. The implication seems quite clear that traditional concepts of negligence with proximate cause were contemplated by legislative intent.

In *Arrendondo v. Duckwall Stores, Inc.*, 227 Kan. 842, 610 P.2d 1107 (1980), the Kansas Supreme Court was faced with the issue of whether or not comparative negligence applied in a personal injury action based on violation of a regulatory statute. "If contributory negligence or an analogous defense *would not* have been a defense to a claim, the comparative negligence statute does not apply; if contributory negligence *would* have been a defense, the statute is applicable." 227 Kan. at 845, 610 P.2d 1107 (emphasis in original). Negligence is also compared where there are joint tortfeasors. *Kennedy v. City of Sawyer*, 228 Kan. 439, 618 P.2d 788 (1980); *Brown v. Keill*, 224 Kan. 195, 580 P.2d 867 (1978). Joint tortfeasors, aside from more than one actor engaged in doing a single tortious act as in the criminal law, of course involves the doctrine of concurrent causes by separate persons or instrumentalities which may arise simultaneously in time or at different

times. The original act of negligence by a tortfeasor must be a continuing one which is joined or augmented by another independent negligent act by another tortfeasor whose act is a part of the total causation of the injury to the recipient of the acts. As stated most succinctly in PIK (Pattern Instructions for Kansas), "a cause is concurrent if it was operative at the moment of injury and acted with another cause to produce the injury." Dr. Luzier could not be a joint or concurrent tortfeasor with Dr. Priddy. He had no part in the events surrounding Chip's birth, and the harm he allegedly caused Chip has no connection to any physical injuries resulting from Chip's birth. If it is shown Chip's injuries stem from the circumstances surrounding his birth, Dr. Luzier will have no fault to compare; if they do not, Dr. Priddy will have no fault with which to compare.

Defendant also seeks review of the Magistrate's order limiting the scope of defendant's discovery. One of Dr. Priddy's theories, companion to the claimed negligent conduct of Dr. Luzier, is that Chip's injuries are not attributable to the events surrounding his birth at all, but are, instead, a result of physical and/or psychological abuse he has received at the hands of his parents since birth. In the hope of proving this, Dr. Priddy seeks to discover medical and military records of the parents, records of the Doran's first child, Raymond James Doran, IV, or Jamie, who died in an automobile accident before Chip was born, and of children once placed with the Dorans for possible adoption. The Magistrate denied this discovery, along with permission to depose other persons claimed to have information as to child abuse or neglect. On the other hand, plaintiffs' motion in limine seeks, *inter alia*, to exclude any possible evidence existing concerning child abuse, failure of the parents to accept Chip's injuries, any lack of love of the parents for their child, any striking of Mrs. Doran by Mr. Doran, or any abuse of Jamie by his parents.

The affidavit of Nancie Palmer, a licensed Master-Social Work, submitted by defendant to support his need for this discovery, indicates a number of "relevant facts, factors and history" which need to be obtained in evaluating a possible instance of child abuse or neglect. Among these factors are several which might be attributable to Dr. Priddy's alleged negligence, such as whether there have been multiple stresses in the family, whether there were problems with the pregnancy or birth, whether there were any special medical problems at birth, and whether the child was hospitalized after birth. The specter of a trial within a trial, with evidence on both sides trying to prove the collateral issue of "Do you still beat your child?" and "Why do you still beat your child?" is a forbidding one, assuming it were a viable issue. Most of the evidence sought would not be admissible in any event. Federal Rules of Evidence 405 prohibits use of specific instances of conduct to prove character, and character evidence would not be admissible even if Dr. Priddy were allowed to prove the Dorans to be child abusers. Even if marginally relevant, the danger of unfair prejudice, undue delay, and confusion of issues as to the minor plaintiff, greatly outweigh its possible probative value under Rule 403. The only other possible role of conduct of the parents or Dr. Luzier as alluded to by defendant's counsel, would be in the area of aggravation of a preexisting injury or condition by a separate, later occurring tort on the infant plaintiff, such as child abuse.

■ As stated above, in reference to Dr. Luzier, the issues in this trial are narrower than defendant seems to realize. Allegedly wrongful conduct outside the narrow time frame of this action is not at issue. The burden of proof by preponderance of the evidence will be upon the plaintiffs to convince a jury that the infant plaintiff's condition began at birth from Dr. Priddy's allegedly negligent activities in the short time period surrounding that birth, and subsequent problems were caused by those activities. Defendant's area of defense is to negative the credibility of plaintiffs' evidence, but not in the nebulous area suggested by that familiar World War II graffiti of "Kilroy was here." The comparison sought by Dr. Priddy is remote, far fetched, and

defies credence. Injection of this theory into the case by allowing discovery would unduly delay justice to the infant plaintiff. Even if child abuse can be proved, the fact of abuse would be so prejudicial to Chip's recovering recompense from any tortfeasor, so as to require exclusion. Fed.R.Evid. 403. The Magistrate was clearly not in error in limiting discovery in these collateral matters. Probably by now the parents have been deposed as to the possibility of child abuse. This Court would have precluded such depositions and the order of Magistrate Wooley in that regard is nullified if it has not already occurred. The only effect of allowing all this additional discovery would be to delay the trial, to the detriment of Chip Doran, and burden all the plaintiffs with unnecessary, expensive, time-consuming discovery.

It would appear, therefore, that plaintiffs' motion in limine is a superfluity, since it refers to the same area as the proscribed discovery. However, lest there be any lingering doubt of the Court's intention, it will be sustained for the reasons stated above as to any area of parental misconduct on the so-called child abuse contention of defendant.

## THE COLLATERAL SOURCE ISSUE

■ Defendant seeks review of the Magistrate's ruling limiting evidence of any collateral source evidence to benefits received before trial. The general rule in Kansas is to exclude evidence which would show damages claimed by a party were in fact paid by someone else, or that services had been provided gratuitously. As a part of its response to what has come to be called the medical malpractice crisis, the Kansas legislature enacted K.S.A. § 60–471, which provides:

"(a) In any action for damages for personal injuries or death arising out of the rendering of or the failure to render professional services by any health care provider, *evidence of any reimbursement or indemnification received by a party* for damages sustained from such injury or death, excluding payments from insurance paid for in whole or in part by such party or his or her employer, and services provided by a health maintenance organization to treat any such injury, excluding services paid for in whole or in part by such party or his or her employer, shall be admissible for consideration by the trier of fact subject to the provisions of subsection (b). Such evidence shall be accorded such weight as the trier of fact shall choose to ascribe to that evidence in determining the amount of damages to be awarded to such party." (Emphasis added.)

The statute speaks of indemnification or reimbursement received and services provided. Evidence of programs providing free assistance, such as free special education, free therapy, free braces and wheelchairs, etc., was excluded by the Magistrate. This Court agrees the statute by its terms does not extend to this kind of evidence. The Court notes that if Chip were to receive a substantial award he would become ineligible for many or all of these charitable programs, even if he would have qualified for them in the first instance. In *Rudolph v. Iowa Methodist Medical Center*, 293 N.W.2d 550 (Iowa 1980), the Iowa Supreme Court considered application of a statute which modified the collateral source doctrine in medical malpractice actions. It found evidence of future eligibility for social security and a retirement plan inadmissible, because there would be "no way to determine the conditions under which those losses might be reimbursed or the amounts which might be paid.... Any findings by the jury regarding such benefits would rest on mere speculation." 293 N.W.2d at 560.

It is the contention of plaintiffs that K.S.A. § 60–471 is unconstitutional under both the United States and the State of Kansas Constitutions. They particularly assert this state statute offends the Equal Protection clause of the Fourteenth Amendment.

Plaintiffs offer as an example of this statute the cases of two hypothetical patients who suffered similar injuries at the hands of the same health care provider.

One is wealthy, and has insurance, while the other has no resources to pay for medical care and is uninsured. The first is able to retain private nursing care, which is paid for by the insurance, while the second, needing the same continual care, is cared for by his wife, who was forced to quit her job to stay home and care for him. It is said the modified collateral source rule would exclude evidence that the private nursing care for the first patient was in fact paid for by the insurance company, while the jury would be apprised of the fact that the second patient's care was provided free by his wife, and perhaps she had been earning only the minimum wage at the job she left.

Another possible scenario involves the plaintiff injured in some kind of accident. His or her injuries are then allegedly aggravated by the negligence of a health care provider. Said provider is joined as a third party defendant, or as a co-defendant in the original action. Particularly because of the comparative negligence law of Kansas, with its abolition of joint and several liability, and its requirement of joinder of claims, plaintiff would of necessity have to assert his or her claims against the health care provider once joined, if at all. Health care provider would be entitled to offer and benefit from evidence of collateral sources, while the original tortfeasor would not. Similar difficulties arise if a defective product, such as an intrauterine birth control device is alleged to be involved, since the manufacturer would not be entitled to benefit from the collateral source evidence.

A number of states have enacted legislation modifying procedures by which patients can seek recovery against health care providers, and this legislation has been the subject of considerable litigation. Some of these challenges have succeeded and many have not. Among the cases which have approved medical malpractice legislation are *Eastin v. Broomfield*, 116 Ariz. 576, 570 P.2d 744 (1977); *Johnson v. St. Vincent Hospital Inc.*, 404 N.E.2d 585 (Ind.1980); *Rudolph v. Iowa Methodist Medical Center*, supra; *Everett v. Goldman*, 359 So.2d 1256 (La.1978); *Attorney General v. Johnson*,

282 Md. 274, 385 A.2d 57, *appeal dismissed*, 439 U.S. 805, 99 S.Ct. 60, 58 L.Ed.2d 97 (1978); *Paro v. Longwood Hospital*, 373 Mass. 645, 369 N.E.2d 985 (1977); *Prendergast v. Nelson*, 199 Neb. 97, 256 N.W.2d 657 (1977); *Parker v. Children's Hospital of Philadelphia*, 483 Pa. 106, 394 A.2d 932 (1978); *State ex rel. Strykowski v. Wilke*, 81 Wis.2d 491, 261 N.W.2d 434 (1978). The initial approval of such a scheme in Florida, in *Carter v. Sparkman*, 335 So.2d 802 (Fla. 1978), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977), was later overruled in *Aldana v. Holub*, 381 So.2d 231 (Fla.1980). Other cases finding this type legislation unconstitutional include *Wright v. Central De Page Hospital Ass'n.*, 63 Ill.2d 313, 347 N.E.2d 736 (1976); *State ex rel. Cardinal Glennon Memorial Hospital v. Gaertner*, 583 S.W.2d 107 (Mo.1979); *Carson v. Maurer*, 424 A.2d 825 (N.H.1980); and *Arneson v. Olson*, 270 N.W.2d 125 (N.D. 1978). In *Jones v. State Board of Medicine*, 97 Idaho 859, 555 P.2d 399 (1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977), the Idaho Supreme Court remanded the case for fact finding on whether there was really a medical malpractice crisis and whether the means adopted were reasonable related to the solution of the problem. Trial courts in Ohio held statutes unconstitutional in *Simon v. St. Elizabeth Medical Center*, 3 Ohio Op.3d 164, 355 N.E.2d 903 (Com.Pl.1976); and *Graley v. Satayatham*, 74 Ohio Op.2d 316, 343 N.E.2d 832 (Com.Pl.1976), as did a California intermediate appellate court in *American Bank & Trust Co. v. Community Hospital of Los Gatos-Saratoga, Inc.*, 104 Cal.App.3d 219, 163 Cal.Rptr. 513 (1980), *hearing granted*, May 29, 1980.

The cases which have found no constitutional problems have been broad attacks upon compulsory arbitration systems which were created and made a condition precedent to maintaining an action in court. Two of those cases, in Arizona and Iowa, involved a discussion of partial abolition of the collateral source rule. Both of these provisions differ from the Kansas statute because they admit evidence of all collateral

sources in medical malpractice cases, and do not distinguish between insurance and "gratuitous" sources, as the Kansas statute does. Therefore, in those states both plaintiffs in the first scenario would have the evidence of collateral sources introduced in their cases.

In *Strange v. James*, 323 F.Supp. 1230 (D.Kan.1971), *aff'd.*, 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972), a three-judge panel of this Court held the Kansas recoupment statute unconstitutional as a burden on a criminal defendant's right to counsel. The Supreme Court declined to reach the right-to-counsel issue. It later rejected this Court's analysis in upholding the Oregon recoupment scheme, *Fuller v. Oregon*, 417 U.S. 40, 94 S.Ct. 2116, 40 L.Ed.2d 642 (1974). Instead, the Supreme Court compared the treatment of the indigent defendants as civil judgment debtors to other judgment debtors. It observed the fact that while other civil judgment debtors enjoyed protections as to the amount of earnings subject to garnishment, of protection from garnishment at times of personal or family illness, and exemptions from attachment and execution of various personal and real property, none of these exemptions were provided the debtor in the recoupment framework. The Court specifically recognized the statute might "betoken legitimate state interests," but held these interests are not thwarted by requiring more even treatment of the indigent defendants. They found the statute to violate "the rights of citizens to equal treatment under the law." 407 U.S. at 141–42, 92 S.Ct. at 2034–35.

█ The instant case deals with a rule of evidence which first applies to parties claimed to have been injured through the wrongful conduct of another only if the putative tort-feasor is a health care provider. It then further discriminates between those who pay for insurance, or have such benefits from their employment, and anyone who must rely upon charity or other gratuitous care. Even if we assume medical malpractice statutes which single out one profession for special protection from rising costs for tortious conduct in a time of general inflation betoken legitimate interests, these interests are not thwarted by requiring more even treatment of indigent injured parties with other classes of injured parties referenced in the same statute. The statute before the Court embodies elements of putativeness and discrimination which violate the rights of citizens to equal treatment under the law. Like the differences in treatment between classes of civil judgment debtors, the discrimination between classes of medical malpractice plaintiffs is lodged within the heart of the judicial process. Rules governing the admissibility of evidence in a civil trial is a type of discrimination not to be approved automatically. Rather, the Court must apply a scrutiny which, as the United States Supreme Court has called it in another context, is "not a toothless one." *Trimble v. Gordon*, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977) (illegitimacy not a suspect class, but statute unconstitutional).

█ This statute is intended to keep down the costs of medical malpractice insurance, and to limit the size of medical malpractice verdicts. The distinction between insured plaintiffs, and ones who must rely upon kindness for some of their pre-litigation care, is not one which furthers that goal. Rather, it substantially undermines that purpose, and at the expense of the indigent litigant. It therefore is violative of the right of all litigants to equal protection under the Fourteenth Amendment to the United States Constitution.

It is also contended that the partial abrogation of the collateral source rule violates various provisions of the Kansas Constitution. An examination of decisions by the Kansas Supreme Court leads this Court to conclude that if this statute were before that court it would find K.S.A. § 60–471 violates the Kansas Constitution.

Article 2, Section 17, of the Kansas Constitution, provides that all laws of a general nature shall have a uniform operation across the state. In *Boyer v. Ferguson*, 192 Kan. 607, 389 P.2d 775 (1964), plaintiffs challenged a "Sunday closing law." The statute in question prohibited sale of a long

list of items, some of which were normally available in plaintiffs' grocery stores, and in the stores of their competitors. Some of these competitors were exempt from the operation of the statute because they were small stores with three or less employees. Any business selling merchandise pertaining to repair or maintenance of farm equipment was also allowed to operate without being affected by the Act. Since a class was defined, and then a large segment of that class exempted from the operation of the statute, the Act was held to not have a uniform application throughout the state.

In *Boyer*, the Court followed *State ex rel. Marshall v. Consumers Warehouse Market, Inc.*, 185 Kan. 363, 343 P.2d 234 (1959), a challenge to the so-called Unfair Practices Act. That Act prohibited the sale of merchandise at prices less than a specified percentage over the seller's costs. Grain and feed sellers were exempt from the Act. This exemption rendered the Act violative of the Kansas Constitution. *Boyer* sets out the pertinent language from *Consumers Warehouse*:

"In the exercise of its power of regulation a state possesses broad discretion in the manner of classification, but discrimination in a regulatory statute must be based on differences and distinctions that have a reasonable and substantial relation to the purposes of the statute and the subject matter thereof." 192 Kan. at 611, 389 P.2d 775.

■ The purpose of K.S.A. § 60–471, according to defendant, is to bring down "medical malpractice costs and corresponding charges to the patients by reducing the amount of jury verdicts." The discrimination between those patients whose collateral source is insurance provided by the patient or patient's employer on the one hand, and one whose collateral source is a family member, or some other source, does not have a reasonable and substantial relation to that purpose. It is the Court's suspicion the exceptions to a great degree swallow the rule, but whether this is so or not, the discrimination is one which renders the statute one which does not have uniform application and is violative of Article 2, Section 17 of the Kansas Constitution.

Sections 1 and 2 of the Bill of Rights of the Kansas Constitution are the equal protection provisions of that document. Section 18 specifies that all persons shall have "remedy by due course of law" for all injuries suffered in person, reputation, or property. Plaintiffs contend these provisions are violated by the statute.

In *Matheny v. City of Hutchinson*, 154 Kan. 682, 121 P.2d 227 (1942), an ordinance licensing cigarette vending machines, which applied only to operations which owned four or more machines, was invalidated under Sections 2 and 18 of the Bill of Rights. Plaintiff claimed it was improper to distinguish between cigarettes sold by machines and cigarettes sold over the counter. The Court noted factors such as the vulnerability of machines to larceny and the difficulties in enforcing the statute prohibiting sale of cigarettes to minors. The Court reasoned it took more municipal police effort to oversee machines than over-the-counter sales. After approving the ordinance against all plaintiff's other arguments, the Court stated the cigarette machine tax was appropriate if levied "on all businesses or avocations exercising the same privileges within each class." 154 Kan. at 690, 121 P.2d 227. The distinction between owning one to three machines, and owning four or more machines, was not related to the reasons justifying taxing only the machines, and the reasons for taxing did not disappear with fewer machines. The classification was held an arbitrary one, and the tax held unconstitutional.

The Kansas guest statute was invalidated in *Henry v. Bauder*, 213 Kan. 751, 518 P.2d 362 (1974), because the classifications provided in the statute were arbitrary and discriminatory and had no rational basis. 213 Kan. at 754, 518 P.2d 362. The classification was between "non-paying guest" and "paying passenger." The Court examined the purposes advanced for these distinctions and looked for the public interest advanced thereby. The purported purposes of the guest statute were promotion of hospitality,

and elimination of collusive lawsuits. Hospitality and ingratitude were rejected, since most motorists are insured. The collusion argument was rejected as overinclusive, leaving all automobile guests remediless to protect insurance companies from some collusive lawsuits. The statute "exceed[ed] the bounds of rationality and constitute[d] a denial of equal protection of the law." *Id.* at 762, 518 P.2d 362.

Applying that analysis to the instant statute, the Court must again consider the purpose of the statute to lower malpractice insurance premiums by lowering malpractice judgments. Under the statute, if the malpractice plaintiff is insured, the statute does not apply. Any other collateral source triggers the statute. Defendant in this case would go so far as to shield a tortfeasor health care provider from having to pay for future private care if some charity or government agency might be available to pick up the tab. In *Henry v. Bauder,* the Court stated the guest statute resulted in throwing out the baby because the bath water was sometimes dirtied (213 Kan. at 762, 518 P.2d 362), likening the baby to the injured guest and the dirt to the occasional collusive suit. The modification of the collateral source rule could be compared to the tub, which is left bottomless by the exception for insurance reimbursement.

Plaintiffs' invocation of Section 18, concerning remedies, is more problematical. If the abolition of the collateral source doctrine only for health care providers is analyzed as a sort of partial immunity for such providers, it may well be vulnerable under *Noel v. Menninger Foundation,* 175 Kan. 751, 267 P.2d 934 (1954); and *Neely v. St. Francis Hospital & School of Nursing,* 192 Kan. 716, 391 P.2d 155 (1964), which abolished common law charitable immunity and its statutory revival. It may also be vulnerable to the rationale of *Flax v. Kansas Turnpike Authority,* 226 Kan. 1, 596 P.2d 446 (1979), which found governmental immunity unconstitutional as applied when the Turnpike Authority was immune while other road maintaining governmental units would not have been under identical circumstances.

It is apparent from *Manzanares v. Bell,* 214 Kan. 589, 522 P.2d 1291 (1974), that some modification of the collateral source doctrine can be accomplished consistent with Section 18 of the Bill of Rights. The No-Fault Insurance Act was upheld, as a proper legislative exercise in modification of the prior law. The Court noted it applied to all who own, operate, maintain or use such a vehicle, and cites *Henry v. Bauder,* supra, noting that legislative power was not the grounds on which the guest statute was invalidated. The distinction between motorcycles and automobiles is qualitatively very different than the difference between financial arrangements of various medical malpractice plaintiffs. There are also financial benefits which a motorcycle insured who opts out of Personal Injury Protection coverage also gives up which accrue to the automobile insured who do not have an option on the benefits. It is the choice of the motorcyclist to opt in or out, he or she is not excluded by law. Malpractice plaintiffs have no way to elect nor any quid pro quo.

One piece of legislation resulting from the "medical malpractice crisis" was approved in *State ex rel. Schneider v. Liggett,* 223 Kan. 610, 576 P.2d 221, *appeal dismissed,* 439 U.S. 808, 99 S.Ct. 66, 58 L.Ed.2d 101 (1978). The defendant had been enjoined from practicing medicine until he obtained malpractice insurance. His equal protection contentions were rejected by the Kansas Supreme Court. He claimed the Act was overinclusive because it included both high and low risk specialties, and underinclusive since it did not include dentists, nurses, lawyers and other professionals. The inclusion of all physicians was approved because its purpose was to make the program actuarially sound, and because even in low risk specialties new practitioners had difficulty obtaining insurance. The omission of other professionals was approved because they were not affected by the malpractice crisis as were doctors. Therefore, there was a rational basis for the classifications. The analysis in *Liggett* gives no aid to proponents of the validity of K.S.A. § 60- 471.

IT IS THEREFORE ORDERED that defendant's motion for review is hereby denied.

IT IS FURTHER ORDERED that the plaintiffs' motion in limine is hereby sustained.