623 F.Supp. 699 (1985)
Katherine CROWE, an Incapacitated Minor, By and Through Her Parents, Natural Guardians and Next Friends, Sally A. CROWE and Frederick J. Crowe, Plaintiff,
v.
Anne WIGGLESWORTH, M.D., Maura Welch, M.D., Individually and as Co-Partners, d/b/a Kaw Valley Women's Health Center, Defendants.
No. 84-1792-K.
United States District Court, D. Kansas.
August 2, 1985.
*700 Charles S. Fisher, Jr., Topeka, Kan., for plaintiff.
Thomas L. Theis, Topeka, Kan., for defendants.

MEMORANDUM AND ORDER
PATRICK F. KELLY, District Judge.
This is a medical malpractice action brought under the Court's diversity jurisdiction. Plaintiff Crowe is an incapacitated minor residing in Oregon, suing through her parents as natural guardians and next friends. Defendants Wigglesworth and Welch are Kansas physicians, partners holding themselves out to the public as the Kaw Valley Women's Health Center. Dr. Wigglesworth provided prenatal care to Sally Crowe, plaintiff's mother, and attended plaintiff's birth in August, 1983. Plaintiff now claims Dr. Wigglesworth was negligent during the labor and delivery, causing plaintiff numerous and severe permanent injuries. Her complaint was filed November 9, 1984, and trial was recently scheduled to begin August 6, 1985.
At the time plaintiff filed her complaint, the modified collateral source rule contained in K.S.A. 60-471 governed the admissibility of evidence of reimbursement or indemnification received by a party injured by the negligence of a health care provider. In late April 1985, the Kansas Legislature repealed K.S.A. 60-471 and, in the substitute for Senate Bill No. 110, enacted a new rule governing the admissibility of this evidence in medical malpractice liability actions. 1985 Kan.Sess.Laws, Ch. 197, Sec. 3. The parties to this case filed briefs addressing the applicability and constitutionality of this rule. For the reasons which follow, the Court concludes Section 3 of the new act applies to this case and that, notwithstanding the Court's serious misgivings about this legislation, within the limited confines of that section, the infringement on plaintiff's rights resulting from abolition of the collateral source rule does not rise to the level of an equal protection violation.
The new act contains three sections. The first is a definitional section. Section 2 establishes a bifurcated procedure for assessing punitive damages in medical malpractice liability actions. It places a ceiling on the total that can be assessed, limits a plaintiff's recovery to 50% of the amount awarded in a given case, and requires the remaining 50% be paid to the state health care stabilization fund. Plaintiff Crowe does not seek punitive damages in the present case. Accordingly, issues concerning the applicability and constitutionality of Section 2 are not before the Court.
Section 3 of the new act, however, directly affects this case. That section abandons, for medical malpractice liability actions, the common law collateral source rule and provides instead defendants are entitled to the benefit of evidence of all reimbursement or indemnification "paid or to be paid to or for the benefit" of a party injured by the negligence of a health care provider. There is no question the section applies to this diversity action. Further, it is clear that even though the Legislature generally intended the entire act to take effect July 1, 1985, it specifically intended Section 3 to apply "to any action pending *701 or brought on or after July 1, 1985, regardless of when the cause of action accrued." (Emphasis added.) 1985 Kan.Sess.Laws, Ch. 197, Sections 3(d), 6. Far more difficult is plaintiff's assertion Section 3 of the act violates her rights, under the federal and state constitutions, to equal protection of the law. Analysis of this issue requires a short historical review.
The common law collateral source rule excluded evidence showing damages claimed by a party were actually paid by someone else, or that services had been provided gratuitously. Doran v. Priddy, 534 F.Supp. 30, 35 (D.Kan.1981). In Grayson v. Williams, 256 F.2d 61, 65 (10th Cir.1958), the Court of Appeals addressed the public policy underlying this rule:
Where part of a wrongdoer's liability is discharged by payment from collateral source ... the question arises who shall benefit therefrom, the wrongdoer or the injured person. No reason in law, equity or good conscience can be advanced why a wrongdoer should benefit from part payment from a collateral source of damages caused by his wrongful act. If there must be a windfall certainly it is more just that the injured person shall profit therefrom, rather than the wrongdoer shall be relieved of his full responsibility for his wrongdoing. We think we may judicially note that notwithstanding that the law contemplates full compensation, incidental losses and handicaps are suffered in a great number of personal injury cases which are not, and cannot be, fully compensated.
See also Restatement (Second) of Torts § 920A(2), Comment b (1979).
Responding to the so-called medical malpractice crisis in 1976, the Kansas Legislature enacted K.S.A. 60-471, which modified the common law collateral source rule. The new evidentiary rule contained in subsection (a) of the statute read:
In any action for damages for personal injuries or death arising out of the rendering of or the failure to render professional services by any health care provider, evidence of any reimbursement or indemnification received by a party for damages sustained from such injury or death, excluding payments from insurance paid for in whole or in part by such party or his or her employer, and services provided by a health maintenance organization to treat any such injury, excluding services paid for in whole or in part by such party or his or her employer, shall be admissible for consideration by the trier of fact subject to the provisions of subsection (b). Such evidence shall be accorded such weight as the trier of fact shall choose to ascribe to that evidence in determining the amount of damages to be awarded to such party.
The federal courts of Kansas were the first to address the constitutionality of K.S.A. 60-471. Judge Rogers upheld the statute against equal protection challenges in Marlatt v. Hutton, No. 76-46-C5 (D.Kan. Apr. 3, 1979), and again in Holman v. The Menninger Foundation, No. 79-4090 (D.Kan. July 13, 1982) (order denying motion in limine). However, in Doran v. Priddy, 534 F.Supp. 30 (D.Kan.1981), Judge Theis ruled K.S.A. 60-471 violated the equal protection clauses of both the United States and Kansas Constitutions. He reached that conclusion largely because of the following hypothetical situation showing the inequitable treatment of two patients suffering similar injuries at the hands of the same health care provider:
One is wealthy, and has insurance, while the other has no resources to pay for medical care and is uninsured. The first is able to retain private nursing care, which is paid for by the insurance, while the second, needing the same continual care, is cared for by his wife, who was forced to quit her job to stay home and care for him. It is said the modified collateral source rule would exclude evidence that the private nursing care for the first patient was in fact paid for by the insurance company, while the jury would be apprised of the fact that the second patient's care was provided free by his wife, and perhaps she had been *702 earning only the minimum wage at the job she left.
534 F.Supp. at 36.
The Kansas Supreme Court was faced with a constitutional challenge to K.S.A. 60-471 only recently, and it agreed with Judge Theis' analysis and conclusion. Wentling v. Medical Anesthesia Services, P.A., 237 Kan. 503, 701 P.2d 939, 950 (Kan. 1985). That Court noted yet another situation highlighting the discriminatory effects of K.S.A. 60-471:
If the statute is to be applied according to its plain language, an even more invidious hypothetical example comes to mind. Assume a married couple is injured in the same catastrophe. They are both treated by the same health care provider with disastrous results. The husband is employed and his employer provides health insurance. The wife is not gainfully employed. In separate actions for similar treatment provided by the same health care provider as a result of the same catastrophe, the fact that the wife's medical expenses were paid by insurance is proper evidence to submit to the jury but the same evidence as it applies to the husband is not. Such a distinction makes no sense whatsoever.
Wentling, 701 P.2d at 950.
Effective July 1, 1985, the Legislature repealed K.S.A. 60-471 and enacted the following rule governing the admissibility of evidence of collateral source benefits:
(a) In any medical malpractice liability action, evidence of the amount of reimbursement or indemnification paid or to be paid to or for the benefit of a claimant under the following shall be admissible: (1) medical, disability or other insurance coverage except life insurance coverage; or (2) workers' compensation, military service benefit plan, employment wage continuation plan, social welfare benefit program or other benefit plan or program provided by law.
(b) When evidence of reimbursement or indemnification of a claimant is admitted pursuant to subsection (a), the claimant may present evidence of any amounts paid to secure the right to such reimbursement or indemnification and the extent to which the right to recovery is subject to a lien or subrogation right.
(c) In determining damages in a medical malpractice action, the trier of fact shall consider: (1) The extent to which damages awarded will duplicate reimbursement or indemnification specified in subsection (a); and (2) the extent to which such reimbursement or indemnification is offset by amounts or rights specified in subsection (b).
1985 Kan.Sess.Laws, Ch. 197, Sec. 3.
Plaintiff Crowe argues Section 3 contains infirmities similar to those of the old statute and is therefore unconstitutional. Defendants respond the new enactment has eliminated the artificial distinctions drawn by K.S.A. 60-471 and works no violation of plaintiff's equal protection rights.
Whether a state statute or regulation violates the equal protection clause depends on the facts and circumstances behind the law, the interests which the state claims to be protecting, and the interest of those who are disadvantaged by the classification. Williams v. Rhodes, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). In legislation of the type here at issue, out of the similarly situated group of persons injured by the tortious acts of others, the state has isolated for different treatment those persons injured by the negligent acts or omissions of health care providers.
The first issue concerns the standard of review used to test the constitutionality of Section 3. Constitutional equal protection analysis involves one of three levels of scrutiny, which have been often stated and need only quick review.
The most stringent standard of review is "strict scrutiny," under which a statute or regulation is stripped of its presumption of constitutionality and the state must demonstrate a compelling governmental interest justifying the classification. The strict scrutiny test applies only to legislation regulating the exercise of a fundamental right *703 or isolating for special treatment a suspect class of persons, i.e., on the basis of race, religion, national origin, etc. San Antonio Independent School District v. Rodriguez, 411 U.S 1, 16-17, 93 S.Ct. 1278, 1287-88, 36 L.Ed.2d 16 (1973). The class of persons injured by medical malpractice has never been recognized as "suspect" under constitutional analysis. There is conflicting authority on the question whether a plaintiff's right to sue and recover for the tortious acts of another is "fundamental" under the Constitution. See Duke Power Co. v. Carolina Env. Study Group, 438 U.S. 59, 93-94, 98 S.Ct. 2620, 2640-41, 57 L.Ed. 2d 595 (1978); Kenyon v. Hammer, 142 Ariz. 69, 688 P.2d 961 (1984); White v. State of Montana, 661 P.2d 1272 (Mont. 1983). However, that particular question need not be resolved here because the Court is faced only with a procedural rule governing the admissibility of evidence. Whatever the nature of plaintiff's right to maintain the action, her right to withhold from the trier of fact particular items of evidence is certainly not "fundamental."
The second, middle-level analytical approach is variously referred to as the "substantial relationship" or "means-scrutiny" test, under which the statutory "classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relationship to the object of the legislation, so that all persons similarly circumstances shall be treated alike." Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971). However, the Supreme Court has applied this intermediate level of inquiry only to gender-based classifications, see Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), and Reed v. Reed, supra; and to classifications based on legitimacy, see Trimble v. Gordon, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977). Although Judge Theis relied on the substantial relationship test to strike down K.S.A. 60-471 in Doran v. Priddy, 534 F.Supp. 30, with all respect to its learned colleague, this Court does not agree an injured plaintiff's right to exclude particular items of evidence in a medical malpractice liability action stands on the same constitutional footing as the right to freedom from discrimination based on one's sex or legitimacy.
The third and most permissive standard is the "rational basis" or "reasonable relationship" test set forth in McGowan v. Maryland, 366 U.S. 420, 425-26, 81 S.Ct. 1101, 1104-05, 6 L.Ed.2d 393 (1961). Under this standard, a statute is presumed constitutional and the challenger bears the burden of proving the classification "rests on grounds wholly irrelevant to achievement of the state's objective." If there exists a rational reason for the disparate treatment, that is, if the classification is rationally related to furthering a legitimate state interest, there is no denial of equal protection. Vance v. Bradley, 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979).
Defendants direct this Court's attention to a host of decisions from other jurisdictions holding all manner of medical malpractice crisis relief statutes, including remedies such as that contained in Section 3, subject only to the rational basis test to determine their constitutionality under the equal protection clause. But blind adherence to this most permissive constitutional standard and the consequent over-indulgence of state legislatures in these matters have been properly criticized as an abdication of judicial responsibility. Jones v. State Board of Medicine, 97 Idaho 859, 555 P.2d 399, 411 (1976). The Supreme Court of Arizona correctly recognized that the various legislative remedies granted to the insurance industry and the medical profession will differently affect a variety of rights held by an injured plaintiff, and that the level of scrutiny employed to test the constitutional sufficiency of a statute depends not on the fact it was enacted in response to the purported crisis but on the nature of the injured party's right which is affected by the particular legislation at issue. See Kenyon v. Hammer, 142 Ariz. 69, 688 P.2d 961, 975 (1984) (holding the rational basis test applies only to those portions of a statute not affecting plaintiff's *704 fundamental right to bring the action).
This Court agrees with the Kenyon v. Hammer analysis and emphatically rejects defendants' suggestion it is bound to apply the most permissive constitutional standard to any and all legislative responses to the alleged crisis. However, at issue in this case is merely a procedural enactment, a rule of evidence, and the Court is satisfied the rational basis test is the appropriate level of inquiry. The question of what level of scrutiny properly applies to other statutes or enactments more directly affecting the right to maintain an action to recover for medical malpractice is reserved for future cases.
Does the new evidentiary rule contained in Section 3 perpetuate the same distinctions for which K.S.A. 60-471 was declared unconstitutional? The fundamental problem with 60-471 was that it excluded all evidence of reimbursement or indemnification received by an injured party whenever that party, or any employer acting on the party's behalf, had made payments in any amount for the insurance. That exception gave rise to the different treatment between wealthy and indigent plaintiffs (Doran v. Priddy, supra) and between employed persons who pay for their insurance and homemakers who do not (Wentling v. Medical Anesthesia Services, P.A., supra). Section 3 does not operate in the same manner as did 60-471. It begins with the principle that evidence of any and all reimbursement or indemnification received by an injured plaintiff is admissible in a medical malpractice liability action, regardless of whether the plaintiff or her employer paid for the insurance or whether it was provided free of cost. If a plaintiff has contributed toward the insurance, evidence of amounts paid to receive the protection may then be admitted to show the net benefit received, as may be evidence of a lien or subrogation right held by the insuror.
Applying Section 3 to the hypothetical fact situation which concerned Judge Theis in Doran leads this Court to believe both wealthy and indigent plaintiffs will now receive substantially similar treatment. Evidence that insurance paid for private nursing care received by a wealthy plaintiff would be admissible, as would evidence that the indigent's care was provided "free" by his wife. The wealthy plaintiff would in turn be entitled to show amounts paid as premiums to receive the insurance, and the indigent plaintiff would be entitled to show wages lost by his wife because of the necessity of caring for him. Nor does Section 3 result in different treatment between persons employed outside of the home and those who are not, the distinction which disturbed the Kansas Supreme Court in Wentling. In the hypothetical situation of that case involving the injured married couple, Section 3 would now require admission of evidence of all insurance benefits received by both husband and wife. If the husband's employer provided his insurance, the husband would be entitled to no offset, but if the husband paid for the family policy covering his wife, she would be entitled to admit evidence showing those amounts paid. The absurd distinctions drawn by K.S.A. 60-471 are no longer apparent in the new rule.
Does Section 3 draw new or different distinctions violating plaintiff's equal protection rights? The inquiry required under the rational basis test is whether any state of facts reasonably may be conceived to justify the statutory discrimination. McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). Three courts faced with this question and applying the rational basis test have concluded abolition of the collateral source rule in medical malpractice liability actions does not violate the equal protection clause. In Eastin v. Broomfield, 116 Ariz. 576, 570 P.2d 744 (1977), the Arizona Supreme Court stated the purpose and constitutionality of a similar legislative enactment in the following terms:
The purpose of this rule is to inform the fact finder of the true extent of the plaintiff's economic loss in order to avoid the inequity of windfall recoveries. The *705 resulting judgments will no doubt reflect a setoff for the benefits the plaintiff has already received and these lower judgments would be reflected in lower malpractice insurance premiums, one of the objectives of the legislation. It should be noted that admission into evidence of plaintiffs' collateral benefits in no way guarantees any reduction in the damages awarded by the trier of fact. The jury may still choose to ignore the collateral benefits in making its decision as to the damages sustained by the plaintiffs.
* * * * * *
... Abolition of the collateral source rule does not deprive the medical malpractice claimant of any property interest accorded protection by the due process clause of the United States Constitution. Nor is the application of the rule only to malpractice actions so arbitrary and unreasonable as to deny to medical malpractice claimants equal protection of the laws. The rule was intended by the legislature to give the jury the true extent of damages sustained by the plaintiff thereby. By scaling down the size of jury verdicts by the amount of collateral benefits the plaintiff may have received, the legislature could reasonably assume that a reduction in premiums would follow. This was one of the reasons for the Act. The legislature is entitled to proceed "one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." Williamson v. Lee Optical Co., 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563, 573 (1955).
570 P.2d at 753. See also Barme v. Wood, 122 Cal.App.3d 395, 176 Cal.Rptr. 42 (1981); and Pinillos v. Cedars of Lebanon Hospital Corp., 403 So.2d 365 (Fla.1981).
Legislative attempts to abolish or modify the collateral source rule in medical malpractice liability actions have not been successful in all states, however. The Supreme Court of North Dakota struck down that state's Medical Malpractice Act on constitutional grounds in part because it "nearly abolished" the collateral source doctrine. Arneson v. Olson, 270 N.W.2d 125, 137 (N.D.1978). In Ohio, a legislative provision closely resembling K.S.A. 60-471 was declared a violation of equal protection because there was found to be no compelling governmental interest in conferring benefits on medical malpractice defendants unavailable to other defendants in tort cases. Graley v. Satayatham, 74 Ohio Ops.2d 316, 343 N.E.2d 832, 836 (1976). Notably, the courts in both cases applied tests other than the rational basis test this Court deems appropriate.
After reviewing these cases and the legislation here at issue, this Court is satisfied the discriminatory treatment required by Section 3 is rationally related to the purported legislative goals. The Legislature could reasonably conclude that insofar as the size of medical malpractice verdicts allegedly affects the so-called crisis, an effort to more closely relate those verdicts to the actual loss suffered by plaintiffs would offer the malpractice insurance companies some relief. To this extent it was deemed reasonable to isolate and require special treatment for medical malpractice plaintiffs. Furthermore, Section 3 does not perpetuate the patent discrimination among various medical malpractice plaintiffs that existed previously under K.S.A. 60-471. All such persons are now subject to a possible reduction of their verdicts for benefits received from collateral sources, after credit for payments made and existing liens or subrogation rights.
This, however, is not to say that the legislation at issue isn't riddled with problems of a very prejudicial nature. Regarding the application of Section 3, the Legislature wholly failed to account for its impact in cases where a plaintiff seeks recovery for injuries in addition to medical malpractice. Judge Theis recognized the same problem with K.S.A. 60-471:
Another possible scenario involves the plaintiff injured in some kind of accident. His or her injuries are then allegedly aggravated by the negligence of a health care provider. Said provider is joined as a third party defendant, or as a co-defendant *706 in the original action. Particularly because of the comparative negligence law of Kansas, with its abolition of joint and several liability, and its requirement of joinder of claims, plaintiff would of necessity have to assert his or her claims against the health care provider once joined, if at all. Health care provider would be entitled to offer and benefit from evidence of collateral sources, while the original tortfeasor would not. Similar difficulties arise if a defective product, such as an intrauterine birth control device is alleged to be involved, since the manufacturer would not be entitled to benefit from the collateral source evidence.
Doran v. Priddy, 534 F.Supp. at 36.
The recent case of Wooderson v. Ortho Pharmaceutical Corp., 235 Kan. 387, 681 P.2d 1038 (1984), best exemplifies Judge Theis' concerns. In 1972, plaintiff Wooderson's physician prescribed for her an oral contraceptive, Ortho-Novum 1/80, manufactured by Ortho Pharmaceutical Corporation (Ortho). Plaintiff ingested the contraceptive for a number of years and ultimately suffered acute renal failure with a variety of complications. The defendants originally named in the suit were Ortho and plaintiff's gynecologists. After pretrial conference, plaintiff settled her claims against the physicians, and the case went to trial solely on the product liability claims against Ortho. Wooderson, 235 Kan. at 412-13, 681 P.2d 1038. Had the medical malpractice claims not been settled, however, under Section 3 the physicians would have been entitled to present evidence at trial of all reimbursement or indemnification paid to or on behalf of plaintiff, while the same evidence would have been inadmissible for the benefit of co-defendant Ortho. In addition to the patent unfairness of isolating the physicians for preferential treatment as against the manufacturer, the situation would clearly create an atmosphere of confusion and consequent prejudice in which any instruction on the narrow purposes for which the jury could consider such evidence would be ineffectual.
Obviously those are not the facts of the present case, and the Court reserves judgment on the question of whether these serious problems in the application of Section 3 will, in a case such as Wooderson, rise to the level of a constitutional violation.
On a more fundamental level, this Court is not at all persuaded this discriminatory legislation is needed or that it will achieve its stated goals. Regarding need, defendants cavalierly refer to the "obvious" medical malpractice crisis justifying this legislation. What is apparently so clear to the medical profession, the insurance industry, their respective lobbyists, and the Legislature is a matter of deep and growing concern to this Court as well as a number of commentators and other courts across the country. In the Legislature's haste to remedy the situation, it has overlooked or, more likely, ignored the fundamental cause of the so-called crisis: it is the unmistakable result not of excessive verdicts, but of excessive malpractice by health care providers.
Further, some courts have found that the highly touted malpractice insurance crisis of 1975-76 was limited to that time period, is no longer an "obvious" crisis, and may not now continue to be used to justify imposing separate and unequal treatment on medical malpractice litigants. Boucher v. Sayeed, 459 A.2d 87, 93 (R.I.1983). Others have rightfully questioned the complicity of the insurance industry in this situation. Citizens of Idaho were treated to the spectacle of medical malpractice insurers insisting on legislative relief in part because of "`abnormally low earnings from investments.'" (Emphasis added.) Jones v. State Board of Medicine, 97 Idaho 859, 555 P.2d 399, 413 (1976). The absurdity of that situation is akin to a products manufacturer requesting and receiving a limitation on liability because of low sales in a previous year. In 1976, the Travelers Insurance Companies faced billion dollar litigation instituted by a physicians' council after Travelers demanded a 486% rate increase; the company ultimately returned *707 50 million dollars in excess premiums. Carlova, How Doctors Forced a Malpractice Carrier to Refund $50 Million, Medical Economics, July 20, 1981, at 171, 172.
Admittedly, plaintiff has submitted no evidence of similar abuses in the State of Kansas, but neither have defendants put forth any proof whatsoever of a current "crisis" justifying the legislation at issue. Other courts have refused to uphold the constitutionality of a particular enactment until such supporting evidence is produced. See Jones v. State Board of Medicine, supra, 555 P.2d at 416. Nevertheless, because the statute presently at issue is simply a procedural rule of evidence, the Court is willing to accept at face value the Legislature's insistence the situation is such as to require this relief, with the caveat that in future cases concerning more fundamental denials of a plaintiff's rights strict proof thereof may be demanded.
Assuming there exists a bona fide malpractice crisis, as this Court now assumes for the purposes of this issue, other courts have questioned whether it even justifies this type of legislative response. Although the constitutional analysis of Graley v. Satayatham, 74 Ohio Ops.2d 316, 343 N.E.2d 832 (1976), has been rejected in the present case, that court's observations on the justification of similar legislation merits careful consideration:
There is no satisfactory reason for this separate and unequal treatment. There obviously is "no compelling governmental interest" unless it be argued that any segment of the public in financial distress be at least partly relieved of financial accountability for its negligence. To articulate the requirement is to demonstrate its absurdity, for at one time or another every type of profession or business undergoes difficult times, and it is not the business of government to manipulate the law so as to provide succor to one class, the medical, by depriving another, the malpracticed patients, of the equal protection mandated by the constitution. Even remaining within the area of the professions, it is notable that the special consideration given to the medical profession by these statutes is not given to lawyers or denists or others who are subject to malpractice suits.
Additionally, assuming a valid legislative purpose to enact laws relating to protection of the public's health, this legislation may be counter-productive. The extending of special litigation benefits to the medical profession certainly cannot be considered as relating to protection of the public health. On the contrary, the quality of health care may actually decline. To the extent that in tort actions of the malpractice type if the medical profession is less accountable than formerly, relaxation of medical standards may occur with the public the victim.
343 N.E.2d at 837-38 (emphasis added).
Even courts which have upheld such legislation under the rational basis test have expressed doubt about whether the challenged legislation will accomplish the aims of lowering the cost of and assuring the availability of medical care for citizens of the state. See Seoane v. Ortho Pharmaceuticals, Inc., 472 F.Supp. 468, 472 (D.La. 1979).
These concerns noted, the Court is of course aware that normally questions regarding the wisdom or likely success of a legislative enactment are not grounds for concluding it violates the Constitution. It is nevertheless possible that in an appropriate case concerning other such legislation the Court could conclude any conceivable "benefits" are sufficiently remote that the statutory discrimination is indeed wholly irrelevant to achievement of the state's ostensible objective.
IT IS THEREFORE ORDERED this 2nd day of August, 1985, that 1985 Kan.Sess. Laws, Ch. 197, Sec. 3, shall apply to the trial of this action and the parties are entitled to the admission of all evidence thereby permitted. Counsel for all parties shall appear before this Court on August 5, 1985, at 4:00 P.M., for a status conference in anticipation of trial.