ROGER L. FARLEY, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF LANA S. FARLEY, *Appellant*, v. SUSAN ENGELKEN, M.D., and COMMUNITY HOSPITAL DISTRICT No. 1, *Appellees.*

No. 59,338

HEATHER DITTO, a minor, and DANIELLE DITTO, a minor, by and through Douglas and Cheryl Ditto, individually and as natural guardians and next friends of Heather Ditto and Danielle Ditto, *Appellees*, v. SHAWNEE MISSION MEDICAL CENTER, *Appellant.*

No. 59,591

CHARLEY RIDGE, *Appellee*, v. PAT BARKER, M.D., *Appellant.*

(740 P.2d 1058)

**664**

Opinion filed July 17, 1987.

*Frank M. Rice,* of Schroer, Rice, P.A., of Topeka, argued the cause and was on the brief for appellant Roger L. Farley.

*Wayne T. Stratton,* of Goodell, Stratton, Edmonds & Palmer, of Topeka, argued the cause, and *Marta Fisher Linenberger,* of the same firm, was with him on the brief for appellees Susan Engelken, M.D., and Community Hospital District No. 1.

*Michael P. Oliver,* of Wallace, Saunders, Austin, Brown, and Enochs, Chrtd., of Overland Park, argued the cause, and *Frank Saunders, Jr.,* and *Michael J. Dutton,* of the same firm, was with him on the briefs for appellant Shawnee Mission Medical Center.

*Donald W. Vasos,* of Vasos, Kugler & Dickerson, of Kansas City, argued the cause and *Stephen G. Dickerson,* of the same firm, *Sidney A. Shapiro,* of Lawrence, and *Lynn R. Johnson,* of Overland Park, were with him on the brief for appellees Heather Ditto and Danielle Ditto.

*Kenneth E. Pierce,* of Reynolds, Pierce, Forker, Suter, O'Neal & Myers, of Hutchinson, argued the cause and was on the briefs for appellant Pat Barker, M.D.

*Stanley R. Juhnke,* of Juhnke and Howell, of Hutchinson, argued the cause and was on the brief for appellee Charley Ridge.

*Jerry G. Elliott,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, and *Stephen M. Kerwick,* of the same firm, were on the brief for *amici curiae* Kansas Medical Society and Kansas Hospital Association.

*Randall E. Fisher,* of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of

Wichita, and *Debra J. Arnett,* and *Carlin J. Pratt,* of the same firm, were on the brief for *amicus curiae* Kansas Association of Defense Counsel.

*Fred N. Six,* of Barber, Emerson, Six, Springer & Zinn, of Lawrence, and *Thomas V. Murray,* of the same firm, and *Derenda J. Mitchell,* special assistant attorney general, of Topeka, were on the brief for *amicus curiae* Fletcher Bell, Kansas Commissioner of Insurance and Administrator of the Kansas Health Care Stabilization Fund.

The opinion of the court was delivered by

HERD, J.: Three interlocutory appeals in medical malpractice suits have been consolidated for a determination of the constitutionality of K.S.A. 1986 Supp. 60-3403 (hereafter 60-3403). In *Farley v. Engelken, et al.,* Case No. 59,314, the district court of Pottawatomie County upheld the constitutionality of the statute and plaintiff has appealed. In the other cases, *Ditto, et al. v. Shawnee Mission Medical Center,* Case No. 59,338, and *Ridge v. Barker,* Case No. 59,591, the district courts of Johnson County and Barber County found the statute to be unconstitutional and the defendants have appealed. Plaintiffs in all three cases are united in interest in asserting the unconstitutionality of the statute and will be referred to collectively throughout this opinion as plaintiffs. As the various health care provider defendants are likewise united in interest in asserting the constitutionality of the statute they will be referred to collectively as defendants.

In addition to the conflicting decisions in our state district courts, a division of authority also exists in the federal trial courts of Kansas. In *Ferguson v. Garmon,* 643 F. Supp. 335 (D. Kan. 1986), and *Crowe by and through Crowe v. Wigglesworth,* 623 F. Supp. 699 (D. Kan. 1985), Chief Judge O'Connor and Judge Kelly upheld the constitutionality of the statute, while in *Coburn by and through Coburn v. Agustin,* 627 F. Supp. 983 (D. Kan. 1985), and *Fretz v. Keltner,* 109 F.R.D. 303 (D. Kan. 1985), Judges Theis and Saffels found the statute unconstitutional.

The primary question presented on appeal is whether 60-3403 violates the equal protection clauses of the Kansas and United States Constitutions and Section 18 of the Kansas Bill of Rights. The statute was enacted in 1985 and abrogates the common-law collateral source rule in "any medical malpractice liability action." The collateral source rule is a common-law rule preventing the introduction of certain evidence, summarized in the

Restatement (Second) of Torts § 920A (1977), as "[p]ayments made to or benefits conferred on the injured party from other sources [which] are not credited against the tortfeasor's liability although they cover all or a part of the harm for which the tortfeasor is liable." In *Allman v. Holleman*, 233 Kan. 781, Syl. ¶ 8, 667 P.2d 296 (1983), we stated the rule as:

"The collateral source rule provides that benefits received by the plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer."

Such payments are commonly known as collateral source benefits or payments. K.S.A. 1986 Supp. 60-3403 is the successor to K.S.A. 60-471, which was found unconstitutional by this court in *Wentling v. Medical Anesthesia Services*, 237 Kan. 503, 701 P.2d 939 (1985).

K.S.A. 1986 Supp. 60-3403 provides:

"**Evidence of collateral source payments and amounts offsetting payments; admissibility; effect.** (a) In any medical malpractice liability action, evidence of the amount of reimbursement or indemnification paid or to be paid to or for the benefit of a claimant under the following shall be admissible: (1) Medical, disability or other insurance coverage except life insurance coverage; or (2) workers' compensation, military service benefit plan, employment wage continuation plan, social welfare benefit program or other benefit plan or program provided by law.

"(b) When evidence of reimbursement or indemnification of a claimant is admitted pursuant to subsection (a), the claimant may present evidence of any amounts paid to secure the right to such reimbursement or indemnification and the extent to which the right to recovery is subject to a lien or subrogation rights.

"(c) In determining damages in a medical malpractice action, the trier of fact shall consider: (1) The extent to which damages awarded will duplicate reimbursement or indemnification specified in subsection (a); and (2) the extent to which such reimbursement or indemnification is offset by amounts or rights specified in subsection (b).

"(d) The provisions of this section shall apply to any action pending or brought on or after July 1, 1985, regardless of when the cause of action accrued."

Plaintiffs assert that the statute unconstitutionally creates a class of plaintiffs in tort litigation, insured or otherwise compensated medical malpractice plaintiffs, who are treated differently from all other plaintiffs in tort litigation. The medical malpractice plaintiffs do not receive the benefit of the collateral source rule while all other tort plaintiffs do receive that benefit. It is also asserted the statute creates a class of tort litigation defendants,

health care providers, who are not subject to the rule, while all other tort defendants are subject to the rule. Defendants, on the other hand, assert the statute is constitutional and that the classifications created are within the legislature's authority in seeking a remedy to a problem of extreme public interest.

The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The Kansas counterpart to the Fourteenth Amendment equal protection clause is found in Sections 1 and 2 of the Bill of Rights of the Kansas Constitution, which provide:

"§ 1. Equal rights. All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness."

"§ 2. Political power; privileges. All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit. No special privileges or immunities shall ever be granted by the legislature, which may not be altered, revoked or repealed by the same body; and this power shall be exercised by no other tribunal or agency."

While these two provisions are given much the same effect as the clauses of the Fourteenth Amendment relating to due process and equal protection of the law (*Henry v. Bauder*, 213 Kan. 751, 752-53, 518 P.2d 362 [1974]), Section 2 of the Kansas Bill of Rights has been construed as referring only to political privileges and not to property rights. When an equal protection challenge is raised involving individual personal or property rights, not political rights, the proper constitutional section to be considered is Section 1 of the Kansas Bill of Rights. *Stephens v. Snyder Clinic Ass'n*, 230 Kan. 115, 128, 631 P.2d 222 (1981).

When a statute is attacked on equal protection grounds, the general rule is that the statute is presumed constitutional, and the burden is on the party attacking the statute to prove otherwise. Only in cases involving "suspect classifications" or "fundamental interests" is the presumption of constitutionality displaced and the burden placed on the party asserting constitutionality to demonstrate a compelling state interest which justifies the classification. *Gumbhir v. Kansas State Board of Pharmacy*, 231 Kan. 507, 521, 646 P.2d 1078 (1982), *cert. denied* 459 U.S. 1103 (1983). In reviewing legislative enact-

ments, the court does not sit to judge the merits or wisdom of the act; the court's limited review of the challenged statute is whether the classifications are reasonable, not arbitrary, and are justified by a legitimate state interest. *City of Wichita v. White,* 205 Kan. 408, 409, 469 P.2d 287 (1970). In other words, does the legislative end justify the classification means?

Before turning to the principal issue, let us review the legal concept of equality. Equality was recognized by the founding fathers as one of man's natural rights, yet, the original Constitution and Bill of Rights contained no equal protection guarantees. It wasn't until the adoption of the Fourteenth Amendment in 1868 that the Constitution formally guaranteed people equal protection of the laws. However, the Fourteenth Amendment applies only to the states. The guarantee of equal treatment under federal law is dependent upon interpretation of the due process clause of the Fifth Amendment, which contains no equal protection clause. See *Shapiro v. Thompson,* 394 U.S. 618, 642, 22 L. Ed. 2d 600, 89 S. Ct. 1322 (1969); *Bolling v. Sharpe,* 347 U.S. 497, 98 L. Ed. 884, 74 S. Ct. 693 (1954).

While equality is the rule and classification the exception, it is readily apparent that complete numerical equality of treatment for all persons is impossible, particularly in a pluralistic, diverse society such as the United States. Thus, some types of classification are inescapable even though they create burdened as well as benefited classes. Classification in application of the law, by its very nature, creates preference to the benefited class. Thus, classification is discriminatory. However, discrimination under proper rules is not prohibited. For instance, equal protection does not require a state to license a blind person to drive a motor vehicle merely because it licenses those with good vision. Nor does equal protection prevent the state from regulating sanitary conditions in restaurants where it does not regulate such conditions in repair shops. We could go on with many illustrations showing that unequal treatment of persons under proper circumstances is essential to the operation of government. On the other hand, the equal protection clause forbids some types of classification. The court's problem has thus been to articulate principles by which constitutional differentiations can be separated from unconstitutional differentiations.

The United States Supreme Court has utilized varying standards in distinguishing constitutional from unconstitutional classification. It currently recognizes and applies three standards, or "levels of scrutiny," in analyzing equal protection claims. The standard of scrutiny increases with the perceived importance of the right or interest involved and the sensitivity of the classification. Of the three articulated tests, the least strict is the "rational" or "reasonable" basis test. In *McGowan v. Maryland*, 366 U.S. 420, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961), the court discussed the rational basis test:

"[T]he Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." 366 U.S. at 425-26.

The next level of judicial review in equal protection cases is of more recent origin. This intermediate level of review is termed "heightened scrutiny" and is applicable to "quasi-suspect" classifications. It requires the statutory classification to substantially further a legitimate legislative purpose. Under this standard, a greater justification for the statutory classification than is required under the rational basis analysis must be shown, including a direct relationship between the classification and the state's goal. *Craig v. Boren*, 429 U.S. 190, 197, 50 L. Ed. 2d 397, 97 S. Ct. 451 (1976). Gender-based classifications have been subjected to middle-level scrutiny, *Reed v. Reed*, 404 U.S. 71, 30 L. Ed. 2d 225, 92 S. Ct. 251 (1971); *Craig v. Boren*, 429 U.S. 190, as have those based on legitimacy, *Pickett v. Brown*, 462 U.S. 1, 76 L. Ed. 2d 372, 103 S. Ct. 2199 (1983); *Trimble v. Gordon*, 430 U.S. 762, 52 L. Ed. 2d 31, 97 S. Ct. 1459 (1977); and *Mathews v. Lucas*, 427 U.S. 495, 49 L. Ed. 2d 651, 96 S. Ct. 2755 (1976).

The most critical level of examination under current equal protection analysis is "strict scrutiny," which applies in cases involving suspect classifications such as race, ancestry, and alienage, and fundamental rights expressly or implicitly guaranteed by the Constitution. Fundamental rights recognized by the

Supreme Court include voting, *Hill v. Stone*, 421 U.S. 289, 44 L. Ed. 2d 172, 95 S. Ct. 1637, *reh. denied* 422 U.S. 1029 (1975); privacy, *Griswold v. Connecticut*, 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (1965); marriage, *Loving v. Virginia*, 388 U.S. 1, 18 L. Ed. 2d 1010, 87 S. Ct. 1817 (1967); *Skinner v. Oklahoma*, 316 U.S. 535, 86 L. Ed. 1655, 62 S. Ct. 1110 (1942); and travel, *Shapiro v. Thompson*, 394 U.S. 618, 22 L. Ed. 2d 600, 89 S. Ct. 1322 (1969). Suspect classifications recognized by the Court include race, *McLaughlin v. Florida*, 379 U.S. 184, 13 L. Ed. 2d 222, 85 S. Ct. 283 (1964); ancestry, *Oyama v. California*, 332 U.S. 633, 92 L. Ed. 249, 68 S. Ct. 269 (1948); and alienage, *Graham v. Richardson*, 403 U.S. 365, 29 L. Ed. 2d 534, 91 S. Ct. 1848 (1971); *Yick Wo v. Hopkins*, 118 U.S. 356, 30 L. Ed. 220, 6 S. Ct. 1064 (1886). Under the "strict scrutiny" test, it must be demonstrated that the classification is necessary to serve a compelling state interest, otherwise it is unconstitutional. *Shapiro v. Thompson*, 394 U.S. at 634. Thus, the burden of proof is shifted from plaintiff to defendant and the ordinary presumption of validity of the statute is reversed.

As the above review illustrates, the level of scrutiny to be applied often determines the constitutionality of the statute. For a more detailed discussion of the three recognized levels of scrutiny, see *Crowe by and through Crowe v. Wigglesworth*, 623 F. Supp. at 702-03.

We now turn to the issue of which standard of scrutiny must be applied to 60-3403. Both plaintiffs and defendants attempt to rely upon *Wentling v. Medical Anesthesia Services*, 237 Kan. 503, 701 P.2d 939 (1985), where we held K.S.A. 60-471, the predecessor to 60-3403, unconstitutional. In *Wentling*, this court quoted at some length from Judge Theis' opinion in *Doran v. Priddy*, 534 F. Supp. 30 (D. Kan. 1981), finding K.S.A. 60-471 unconstitutional, and then stated, "A majority of the members of this court are in agreement with the conclusions reached by Judge Theis." 237 Kan. at 516-18. The conclusion reached by Judge Theis, and approved by the majority, was that in analyzing K.S.A. 60-471 the court "must apply a scrutiny which . . . is 'not a toothless one.' " 534 F. Supp. at 37 (quoting *Trimble v. Gordon*, 430 U.S. 762). Judge Theis concluded that, because of the important nature of the rights affected by the statute under

review, the court must apply a more stringent standard of review than that applied under the rational basis test. Thus, in *Wentling,* without specifically so stating, we applied the heightened scrutiny test under the United States Constitution. While we are concerned here with the same issue, as hereinafter demonstrated, the Kansas Constitution affords separate, adequate, and greater rights than the federal Constitution. Therefore, we clearly and expressly decide this case upon Sections 1 and 18 of the Kansas Bill of Rights. See *Michigan v. Long,* 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983).

In addition to our holding in *Wentling,* other considerations would indicate a heightened scrutiny analysis is appropriate in this case. For instance, Section 18 of the Kansas Bill of Rights provides that all persons, for injuries suffered in person, reputation, or property, shall have a remedy by due course of law, and justice administered without delay.

In *Ernest v. Faler,* 237 Kan. 125, 697 P.2d 870 (1985), we considered the nature of the right granted in Section 18. The specific issue facing the court in *Ernest* was whether K.S.A. 2-2457 (repealed L. 1986, ch. 8, § 2) was unconstitutional on the basis that it results in a denial of due process of law and equal protection of the law. K.S.A. 2-2457 required a person damaged from a pesticide application to file, within 60 days after the date the damage was discovered, a written statement with the county attorney that he had been damaged in order to maintain a civil action to recover damages.

Justice (now Chief Justice) Prager, writing for the court, first reviewed the various tests applied when considering whether a statute offends the equal protection clause and noted that in cases involving "suspect classifications" or "fundamental interests" the courts adopt an attitude of active and critical analysis, requiring the courts to consider the nature of the rights affected by the legislation, the classification established, and the governmental interests necessitating the classification. 237 Kan. at 129-30. The court reasoned:

"The right of the plaintiff involved in this case is the *fundamental constitutional right to have a remedy for an injury to person or property by due course of law.* This right is recognized in the Kansas Bill of Rights § 18, which provides that all persons, for injuries suffered in person, reputation or property, shall have

a remedy by due course of law, and justice administered without delay. In 1904, the term, 'remedy by due course of law,' was defined in *Hanson v. Krehbiel*, 68 Kan. 670, 75 Pac. 1041 (1904), as follows:

' "Remedy by due course of law," as used in section 18 of the bill of rights, means the reparation for injury, ordered by a tribunal having jurisdiction, in due course of procedure and after a fair hearing.' " 237 Kan. at 131. (Emphasis added.)

Defendants argue 60-3403 does not impair plaintiffs' right to a remedy because plaintiffs can still sue and recover damages against a health care provider in Kansas; thus, no fundamental right is affected. Admittedly, 60-3403 does not eliminate a medical malpractice victim's right to bring suit. However, it impairs his remedy if a jury determines the victim is not entitled to full compensation from the defendant because the victim has received benefits from independent sources.

While we do not reach the issue of whether 60-3403 violates Section 18 of the Kansas Bill of Rights, we find that the right of a victim of medical malpractice to a remedy against the person or persons who wronged him is sufficiently threatened by 60-3403 to require a higher standard of review than the rational basis test.

The rationale for applying a higher level of scrutiny to this particular legislation is well stated by Learner, *Restrictive Medical Malpractice Compensation Schemes: A Constitutional "Quid Pro Quo" Analysis to Safeguard Individual Liberties*, 18 Harv. J. on Legis. 143, 184, 189 (1981). Learner compares the political powerlessness of the class of future medical malpractice victims to that of traditional "suspect" and "semi-suspect" classifications—*e.g.*, minorities, women, illegitimates, and aliens. He reasons that certain similar characteristics (*e.g.*, lack of group cohesiveness and political disorganization) justify treating future malpractice victims similarly to other politically powerless, semi-suspect classes who receive judicial protection through an enhanced scrutiny of legislation critically affecting their individual rights. Learner concludes:

"When the legislative balancing process is unduly skewed by the structural inability of the burdened class to form active political coalitions, a court must be sensitive to its institutional role as a counter-majoritarian monitor of legislative legitimacy. The political powerlessness of future medical malpractice victims arguably justifies their status as a semi-suspect class entitled to judicial protection against majoritarian subjugation of individual rights." p. 189.

We further note that other jurisdictions which have considered equal protection challenges under the Fourteenth Amendment to statutes abrogating the collateral source rule in medical malpractice cases have also applied a more rigorous scrutiny than that applied under the rational basis test. For example, in *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825 (1980), the New Hampshire Supreme Court held that, while the right to recover for injuries is not a fundamental right in New Hampshire, the right to be indemnified against medical malpractice is "sufficiently important to require that the restrictions imposed on those rights be subjected to a more rigorous judicial scrutiny than allowed under the rational basis test." 120 N.H. at 931-32. The Supreme Court of North Dakota also used an intermediate level of scrutiny to hold a similar statute invalid in *Arneson v. Olson*, 270 N.W.2d 125 (N.D. 1978). The court there noted this intermediate test required a "close correspondence between statutory classification and legislative goals." 270 N.W.2d at 133. See also *Graley v. Satayatham*, 74 Ohio Op. 2d 316, 320, 343 N.E.2d 832 (1976), where the Ohio court held the crucial question is whether there is an appropriate governmental interest suitably furthered by the differential treatment; and *Jones v. State Board of Medicine*, 97 Idaho 859, 555 P.2d 399 (1976), in which the Supreme Court of Idaho determined the standard of review was whether the statute reflected any reasonably conceived public purpose and whether the establishment of the classification had a fair and substantial relation to the achievement of the governmental objective and purpose. Further, two federal district courts of Kansas have applied a heightened level of scrutiny in finding 60-3403 unconstitutional. See *Coburn by and through Coburn v. Agustin*, 627 F. Supp. 983, and *Fretz v. Keltner*, 109 F.R.D. 303 (D. Kan. 1985).

It is also worthy of mention that in all of the above-mentioned cases (except *Jones*) the courts held statutes abrogating the collateral source rule unconstitutional. In *Jones*, the court remanded the case for determination of questions pertinent to the equal protection challenges. 97 Idaho at 877.

We recognize that a number of courts, facing the issue now before us, have opted to apply the less stringent rational basis

test. See, *e.g.*, *Eastin v. Broomfield*, 116 Ariz. 576, 570 P.2d 744 (1977); *Pinillos v. Cedars of Lebanon Hospital Corp.*, 403 So. 2d 365 (Fla. 1981); *Bernier v. Burris*, 113 Ill. 2d 219, 497 N.E.2d 763 (1986); *Rudolph v. Iowa Methodist Medical Ctr.*, 293 N.W.2d 550 (Iowa 1980).

We further recognize that this court has previously applied a "rational basis" test to uphold the constitutionality of malpractice "crisis" legislation. See, *e.g.*, *Stephens v. Snyder Clinic Ass'n*, 230 Kan. 115, 631 P.2d 222 (1981), and *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 576 P.2d 221 (1978). However, both of these cases are distinguishable from the present case.

In *Liggett*, this court upheld the constitutionality of the Kansas Health Care Provider Insurance Act against a physician's complaint that combining high-risk physicians with low-risk practitioners violated his equal protection rights. The *Liggett* court determined there is no "fundamental interest" involved in the practice of medicine or in any other profession. Therefore, the court concluded the defendant's equal protection challenge must be gauged by the traditional "rational relationship" test. 223 Kan. at 618. *Liggett* is clearly distinguishable from the instant case as the legislation in question in *Liggett* did not classify or burden victims of medical malpractice.

In *Stephens*, the court upheld legislation imposing a shorter limitation period for tort actions brought against health care providers as constitutional. However, the court did not consider whether a heightened standard of review was appropriate. Instead, the court simply cited *Liggett* as support for its application of the "reasonable basis" test. *Stephens* is also distinguishable from this case since the legislation at issue in *Stephens* did not prevent an injured party from obtaining a full remedy from the negligent tortfeasors. Instead, it limited the time period in which an action could be brought.

Finally, while we are aware the United States Supreme Court has applied heightened scrutiny to very limited classifications, we are interpreting the Kansas Constitution and thus are not bound by the supremacy clause of the federal Constitution.

Having determined the appropriate standard of review, we now turn to the question of whether the equal protection clause

of the Kansas Constitution is violated by the statutory abrogation of the collateral source rule in medical malpractice actions. In order to resolve this question, we must balance the interests of the burdened class (insured or otherwise compensated victims of medical malpractice) and the benefited class (negligent health care providers and their insurers) with the goal of the legislation (to insure quality and available health care). Finally, we must decide whether the classifications substantially further a legitimate legislative objective.

K.S.A. 1986 Supp. 60-3403 singles out a class of persons and organizations (negligent health care providers) for preferential treatment not extended to any other tortfeasors. This particularly narrow class of defendants is relieved of professional accountability for their actions when a plaintiff has received compensation through other means.

An examination of the effect of 60-3403 upon the disadvantaged class—insured or otherwise compensated victims of medical malpractice—provides stark contrast. These victims of medical malpractice, unlike other tort claimants, are denied compensation from the person or persons who have wronged them. In effect, it gives a negligent health care provider a credit against the damage the provider inflicts on its victim in the amount of the value of the victim's independent contractual rights. Thus, the statute renders the damage award one of need rather than actual compensation for loss.

As pointed out by the Ohio court in *Graley v. Satayatham*, 74 Ohio Op. 2d at 320, there can be no satisfactory reason for such separate and unequal treatment. The Ohio court states:

"There obviously is 'no compelling governmental interest' unless it be argued that any segment of the public in financial distress be at least partly relieved of financial accountability for its negligence. To articulate the requirement is to demonstrate its absurdity, for at one time or another every type of profession or business undergoes difficult times, and it is not the business of government to manipulate the law so as to provide succor to one class, the medical, by depriving another, the malpracticed patients, of the equal protection mandated by the constitution. Even remaining with the area of the professions, it is notable that the special consideration given to the medical profession by these statutes is not given to lawyers or dentists or others who are subject to malpractice suits."

Similar relevant commentary is found in *Kenyon v. Hammer*, 142 Ariz. 69, 84, 688 P.2d 961 (1984), where the Supreme Court

of Arizona held unconstitutional a statute which required medical malpractice actions to be brought within three years from the date of injury. The court reasoned:

"It may be argued, of course, that the high premiums in malpractice cases work an economic hardship on physicians and that, therefore, the special statute of limitations should be sustained as a necessary 'relief measure' for health care providers. We doubt the factual premise for such an argument. More importantly, however, we believe that the state *has neither a compelling nor legitimate interest in* providing economic relief to one segment of society by depriving those who have been wronged of access to, and remedy by, the judicial system. If such a hypothesis were once approved, any profession, business or industry experiencing difficulty could be made the beneficiary of special legislation designed to ameliorate its economic adversity by limiting access to the courts by those whom they have damaged. Under such a system, our constitutional guarantees would be gradually eroded, until this state became no more than a playground for the privileged and influential. We believe this is exactly what those guarantees were designed to prevent." (Emphasis added.)

K.S.A. 1986 Supp. 60-3403 is one of several statutes enacted by the legislature in 1985 and 1986 in its ongoing attempts to deal with the so-called medical malpractice insurance crisis. See K.S.A. 1986 Supp. 60-3401 through 60-3414. The legislative purpose in enacting the statutes is set forth in K.S.A. 1986 Supp. 60-3405, which states:

"Substantial increases in costs of professional liability insurance for health care providers have created a crisis of availability and affordability. This situation poses a serious threat to the continued availability and quality of health care in Kansas. In the interest of the public health and welfare, new measures are required to assure that affordable professional liability insurance will be available to Kansas health care providers, to assure that injured parties receive adequate compensation for their injuries, and to maintain the quality of health care in Kansas."

Thus, by abrogating the collateral source rule in medical malpractice actions, the legislature has attempted to reduce or eliminate malpractice verdicts, thereby effectuating a reduction in liability insurance premiums. A reduction in premiums will allegedly insure the continued availability and quality of health care in this state.

While the legislature's purpose in enacting 60-3403 may have been to increase the quality and availability of health care, application of such a statute is counterproductive. It is a major contradiction to legislate for quality health care on the one hand,

while on the other hand, in the same statute, to reward negligent health care providers. As at least one court has observed, if the medical profession is less accountable than formerly, relaxation of medical standards may occur with the public the victim. *Graley v. Satayatham*, 74 Ohio Op. 2d at 320. Further, while the effect of 60-3403 may be to lower liability insurance premiums to the benefited class, it may also result in an increased insurance burden on the injured victims, their insurers, and the general public. The reasoning of the Supreme Court of New Hampshire in *Carson v. Maurer*, 120 N.H. at 939-40, is instructive on this point:

"We first note that, '[a]bolition of the [collateral source] rule . . . presents the anomalous result that an injured party's insurance company may be required to compensate the victim even though the negligent tortfeasor is fully insured. Not only does this abolition patently discriminate against the victim's insurer, it may eventually result in an increased insurance burden on innocent parties.' [Citation omitted.] Thus, although RSA 507-C:7 I (Supp. 1979) may result in lower malpractice insurance rates for health care providers, it may also increase the cost of insurance for members of the general public because they are potential victims of medical negligence.

. . . .

"Finally, although the collateral source rule operates so as to place some plaintiffs in a better financial position than before the alleged wrong, its abolition will result in a windfall to the defendant tortfeasor or the tortfeasor's insurer. Moreover, this windfall will sometimes be at the expense of the plaintiff, because 'in many instances the plaintiff has paid for these [collateral] benefits in the form of . . . concessions in the wages he received because of such fringe benefits.' [Citation omitted.] Thus, when the collateral payments represent employment benefits, the price for the public benefit derived from RSA 507-C:7 I (Supp. 1979) will be paid solely by medical malpractice plaintiffs."

Thus, 60-3403 places a heavy burden not only upon the injured plaintiff but also upon the victim's insurer and potentially the general public. Further, if it is true, as the legislature has determined, that a health care "crisis" exists, the burden of remedying that crisis should not be placed solely upon the shoulders of malpractice victims. Rather, it more appropriately should fall upon those causing the crisis—the negligent health care providers. A number of courts agree. See, *e.g., Coburn by and through Coburn v. Agustin*, 627 F. Supp. at 995-96; and *Crowe by and through Crowe v. Wigglesworth*, 623 F. Supp. at 706. In *Crowe*, Judge Kelly states:

"On a more fundamental level, this Court is not at all persuaded this discriminatory legislation is needed or that it will achieve its stated goals. Regarding need, defendants cavalierly refer to the 'obvious' medical malpractice crisis justifying this legislation. What is apparently so clear to the medical profession, the insurance industry, their respective lobbyists, and the Legislature is a matter of deep and growing concern to this Court as well a a number of commentators and other courts across the country. In the Legislature's haste to remedy the situation, it has overlooked or, more likely, ignored the fundamental cause of the so-called crisis: *it is the unmistakable result not of excessive verdicts, but of excessive malpractice by health care providers.*" (Emphasis added.)

We further point out that under K.S.A. 60-3403 in a case involving both medical malpractice and products liability, collateral source evidence would be admissible in the malpractice portion of the trial and inadmissible in the products liability portion. Since a jury would be unable to erase the collateral source evidence once admitted for malpractice purposes, the trial would have to be bifurcated with separate juries on each issue, creating an unworkable administration of justice under comparative fault principles.

K.S.A. 60-3403 is a not so subtle attempt to alter civil jury trials contrary to constitutional guarantees.

We conclude the classifications created by 60-3403 treat both negligent health care providers and their victims differently from other persons similarily situated and do not substantially further a legitimate legislative objective, contrary to law.

We hold K.S.A. 1986 Supp. 60-3403 unconstitutional under the equal protection clause of the Bill of Rights of the Kansas Constitution.

The trial court's decision in Case No. 59,314 is reversed, the decisions in Case Nos. 59,338 and 59,591 are affirmed, and the three cases are remanded for proceedings consistent with this opinion.

LOCKETT, J., concurring: I agree with the Court that K.S.A. 1986 Supp. 60-3403 violates the equal protection clause of the Bill of Rights of the Kansas Constitution and is therefore unconstitutional. However, I do not endorse a further division of the traditional two-tier approach to equal protection analysis by the adoption of "heightened scrutiny," nor do I believe such an adoption is necessary to reach the court's result.

In our common-law system, a decision declaring the rights of

parties is based on one of several devices available to the court, such as a maxim, a doctrine, a precedent, a statute, or public policy.

The power of the legislature as the direct representative of the people first allows the legislature to determine public policy. Where the legislature has declared the public policy clearly, the courts may only determine its constitutionality. Where the legislature has enacted statutory provisions that do not unequivocally state the public policy, the courts may interpret the intention of the legislature. If the legislature fails to state clearly the public policy, then a court in a proper case and controversy may declare the legislature's statement void for vagueness. If the legislature fails or refuses to state the public policy, only then may the courts determine the public policy.

The role of the courts in equal protection cases is to determine the constitutionality of legislation which classifies similar groups of individuals unequally. In some cases, the classification itself is designated as "suspect." In others, while the classification is not suspect, the individual right affected is denominated as "fundamental". If the case involves fundamental rights or suspect classifications, legislation will be subject to strict judicial scrutiny, and will prevail only if justified by "compelling state interest." On the other hand, state regulation bearing upon rights and classifications not so denominated are subject to less rigorous judicial scrutiny. Such legislation will pass the constitutional test if the purpose of the classification has a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike, or if it bears a rational relationship to a state objective that is sought to be advanced by the operation of the legislation. The litmus test merely depends upon whether the right is or is not fundamental or whether the classification is or is not suspect.

A fundamental right exists only if explicitly or implicitly guaranteed by the Constitution. The court here has recognized that the rights implicated by the statute in question cannot be designated as fundamental and that strict scrutiny is not the proper level of analysis in this case. Instead, the court chooses to adopt a third level of analysis, "heightened scrutiny," as a basis for striking down the statute. Citing the United States Supreme

Court decision in *Craig v. Boren*, 429 U.S. 190, 50 L. Ed. 2d 397, 97 S. Ct. 451 (1976), the court states that heightened scrutiny requires the statutory classification to "substantially further a legitimate legislative purpose" as well as to embody a "direct relationship between the classification and the state's goal."

I do not agree that decisions of the United States Supreme Court have clearly established a third level of scrutiny to be applied in equal protection cases. Rather, as the dissent states, the Supreme Court has restricted intermediate scrutiny and has declined to extend the doctrine beyond cases involving gender and illegitimacy. See *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 49 L. Ed. 2d 520, 96 S. Ct. 2562 (1976) (age), and *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985).(mental retardation).

The instant case deals with a rule of evidence which applies to tort victims injured by negligent health care providers. Since it does not involve a suspect class or a fundamental right, or any discrimination based on gender or illegitimacy, I believe that the rational relationship test should be applied. However, even under this test, basic tenets of fairness and equality must not and cannot be abandoned. Even in forms of legislation analyzed under the rational relationship test, we must still seek the assurance that the classification at issue bears a fair relationship to a legitimate public purpose.

Those who are injured by the act of a negligent tortfeasor form a separate class. By enacting K.S.A. 1986 Supp. 60-3403, the legislature has, in effect, split this class of tort victims by making evidence of collateral source payments admissible *solely* in cases involving victims of medical negligence. It is unjust and patently unfair to single out those injured by health care providers and allow juries in such cases to consider collateral source payments and potentially reduce awards.

Equal justice requires that all who are injured by another's negligent act have an equal right to compensation from the negligent tortfeasor, regardless of any classification that the legislature has attempted to impose. We are not correcting the legislature, we are simply performing our constitutional duty by deciding that the creation of separate classes of tort victims based on the classification of the tortfeasor is unconstitutional. The

legislature has powers separate from the judiciary. If the legislature wishes to change the rules of evidence by abrogating the collateral source rule, it may do so if it is applied equally to all who are injured by the negligent acts of another.

Finally, I believe it is incumbent to point out that K.S.A. 1986 Supp. 60-3403 contains an inherent ambiguity which could produce difficulties in application. Subsection (a) states:

"In any medical malpractice liability action, evidence of the amount of reimbursement or indemnification paid or to be paid to or for the benefit of a claimant under the following *shall* be admissible . . . ." (Emphasis supplied.)

Subsection (b) states:

"When evidence of reimbursement or indemnification of a claimant is admitted pursuant to subsection (a), the claimant *may* present evidence of any amounts paid to secure the right to such reimbursement . . . ." (Emphasis supplied.)

Thus, the admission of evidence of payments *by* the claimant to secure any type of reimbursement appears permissive and discretionary while admission of evidence of collateral source payments *to* the claimant is mandatory. As written, the statute could be interpreted to give a judge in a particular case the discretion to admit or exclude evidence of a plaintiff's payments. It is unlikely that the intent of the legislature in enacting this statute was to confer greater rights upon defendants than upon plaintiffs.

ALLEGRUCCI, J., joins the foregoing concurring opinion.

HOLMES, J. dissenting: I respectfully dissent from the principal and concurring opinions and the resultant decision holding K.S.A. 1986 Supp. 60-3403 (hereinafter simply 60-3403) unconstitutional as violating the Kansas Bill of Rights.

At the outset, in fairness to the litigants, counsel, and the bar of Kansas, I feel it is incumbent upon this court to comment upon the procedural morass which caused these cases to languish in the bowels of the court for over seven months. These cases were initially argued to the court on December 4, 1986, and in the normal course of events an opinion would have been forthcoming in approximately six weeks. The original appeals in these cases sought a determination of whether 60-3403 was unconstitutional as violating the equal protection and due process clauses of the United States and Kansas Constitutions. On February 20,

1987, a majority of this court determined, *sua sponte*, that the cases should be reargued and that counsel should submit supplemental briefs on the issue of whether 60-3403 is unconstitutionally vague and indefinite. Thereafter, the case was reargued on March 27, 1987, and the decision is now finally forthcoming. It is interesting that the issue of whether the statute is unconstitutionally vague and indefinite, which was of such momentous importance less than five months ago, is not even mentioned in the principal opinion and receives only cursory consideration in the concurring opinion.

Although the principal opinion purports to be based upon "Sections 1 and 18 of the Kansas Bill of Rights," it also asserts that "we do not reach the issue of whether 60-3403 violates Section 18 of the Kansas Bill of Rights." As there is no further mention of the due process clause in Section 18, I can only assume that the opinion relies solely upon the equal protection clause found in Section 1 of the Kansas Bill of Rights. I cannot agree that 60-3403 is a violation of the equal protection clauses of either the Kansas Bill of Rights or the United States Constitution.

The principal opinion, in arriving at the decision that 60-3403 is unconstitutional, has not only abandoned the federal constitutional attacks upon the statute, evidently conceding that they lack merit, but has also, in my opinion, abandoned prior Kansas law. Without being too repetitive, these appeals question the power of the legislature to modify the effect of the collateral source rule of evidence in medical malpractice cases. The legislature, in its continuing attempts to alleviate the medical malpractice insurance crisis, determined that 60-3403 was warranted and necessary in its attempt to maintain the desired legislative objective of continued quality health care in Kansas.

K.S.A. 1986 Supp. 60-3403 is one of several statutes enacted in 1985 and 1986 to deal with the so-called medical malpractice insurance crisis. See K.S.A. 1986 Supp. 60-3401 through 60-3414. The legislative purpose in enacting the statutes is set forth in K.S.A. 1986 Supp. 60-3405, which states:

"Substantial increases in costs of professional liability insurance for health care providers have created a crisis of availability and affordability. This situation poses a serious threat to the continued availability and quality of health care in Kansas. In the interest of the public health and welfare, new measures are

required to assure that affordable professional liability insurance will be available to Kansas health care providers, to assure that injured parties receive adequate compensation for their injuries, and to maintain the quality of health care in Kansas."

While 60-3405 through 60-3414 were enacted in 1986, it is clear from the legislative history of the 1985 statutes that the same concerns, considerations, and purposes were considered by the legislature in adopting 60-3401 through 60-3404 as are reflected in 60-3405. The claimed unavailability and excessive cost of medical malpractice insurance and its asserted detrimental effect upon the quality and availability of medical care in Kansas is not a recent development. As early as 1971, the problems of obtaining and maintaining affordable medical malpractice insurance came before the legislature and in 1975 and 1976 the first legislation addressing the problem was enacted. See *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 611, 576 P.2d 221 (1978). The earlier legislation obviously has not been effective in controlling the costs of medical malpractice insurance as premiums have continued to skyrocket. The health care providers and their malpractice insurance companies have waged a continuous fight before each session of the legislature to secure additional legislation directed at their specific problems. The statute now before the court is one of those enacted to address those problems.

The theory behind the adoption of 60-3403, which modifies the common-law collateral source rule in medical malpractice cases, is that if the jury is advised that a malpractice plaintiff has already been paid his medical costs, lost wages, or other items of traditional tort damages those payments will probably not be duplicated by the jury in its verdict, resulting in lower verdicts in medical malpractice cases. The lowered verdicts will result in lower payments by medical malpractice insurance carriers who in turn will then lower the premiums which have become prohibitive in many cases. It is claimed that if the lower verdicts do not result in premium reductions, they will at least stop or slow down the ever-increasing premiums charged by the insurance carriers.

Even though I, along with some other members of this court, may have serious doubts that these statutes, and in particular 60-3403, will accomplish the results sought by the legislature, it

is not for this court to determine the validity of the statute based upon our personal opinions of its propriety. In *Moody v. Board of Shawnee County Comm'rs*, 237 Kan. 67, 697 P. 2d 1310 (1985), the court stated:

"The propriety, wisdom, necessity and expediency of legislation are exclusively matters for legislative determination. Courts will not invalidate laws, otherwise constitutional, because the members of the court do not consider the statute to be in the public interest; what the views of the members of the court may be upon the subject [are] wholly immaterial. It is not the province nor the right of courts to determine the wisdom of legislation touching the public interest, as that is a legislative function with which courts cannot interfere." 237 Kan. at 74.

Our function as a court is limited to interpretation and enforcement of the laws enacted by the legislature, and only if a statute is clearly unconstitutional may we strike down an act of the legislature. Our personal views and beliefs must not be allowed to control our consideration of legislative acts. Suffice it to say, the legislative history of 60-3403 included in the record before this court in *Farley v. Engelken* consists of some 422 pages. The appropriate legislative committees had voluminous evidence, oral and written, presenting the arguments and positions of the health care providers and their insurance carriers favoring the legislation and those of the various groups opposing the legislation. Regardless of the personal opinions of members of this court, the legislature had before it considerable evidence supporting the conclusion that 60-3403 may be an effective way of accomplishing the desired legislative objectives. The justices supporting the principal opinion have taken it upon themselves to determine the wisdom and propriety of the statute and to conclude the statute is "counterproductive," contrary to the dictates of *Moody* and many earlier cases. In doing so, the decision ignores the record before the court.

Our decisions in *State ex rel. Schneider v. Liggett*, 223 Kan. 610, and *Stephens v. Snyder Clinic Ass'n*, 230 Kan. 115, 631 P.2d 222 (1981), make it clear the court has accepted the legitimacy of the state's interest in assuring the continued availability of health care to the citizenry and the legislature's determination that a medical malpractice insurance crisis exists. Beyond this recognition of a legitimate state interest in assuring adequate health care for the public, the court has also recognized that

legislation limited in its application to medical malpractice actions is constitutional and shall be subject to the rational basis test. The court is in no position to now substitute its judgment for that of the legislature as to the propriety of the statute. That is not the function of an appellate court.

In *Liggett*, the court examined the constitutionality of the Kansas Health Care Provider Insurance Act in light of a physician's complaint that combining high-risk physicians (surgeons, anesthesiologists, etc.) with low-risk practitioners (family doctors, general practitioners, etc.) violated his equal protection rights. Liggett also claimed an equal protection violation resulted from the failure of the statute to include other professionals, *i.e.*, dentists, lawyers, and nurses. The court upheld the statute, stating:

"We are of the opinion that equal protection is not offended by including high risk and low risk practitioners together. The legislature found the medical health care crisis was affecting all health care providers in this state although the primary impact fell on specialists in high risk areas. Even new doctors practicing in low risk fields were beginning to find it difficult, if not impossible, to obtain coverage. In addition, evidence showed that low risk practitioners needed high risk specialists in order to provide comprehensive care for their patients. Were insurance coverage unavailable for the specialists in high risk fields, the evidence indicates these professionals would either leave the state or would soon quit the practice, causing a general decline in the overall quality of health care available in this state.

"The insurance commissioner testified before legislative committees that the insurance pool had to include low risk providers as well as high risk practitioners or the entire program would be actuarially unsound. We therefore find the purposes of the act and the classifications of physicians within the act were related as a means to accomplish those purposes." 223 Kan. at 620.

In *Stephens*, the court was called upon to decide the constitutionality of K.S.A. 60-513(c) in the face of an equal protection challenge. The statute imposed a shorter period of limitations for actions in medical malpractice cases than other tort actions and was adopted as a result of the "medical malpractice insurance crisis." The plaintiff maintained the statute created a classification which was arbitrary, discriminatory, and without a rational basis. The court applied the "reasonable basis" test and found the differentiation between "health care providers" and other tortfeasors acceptable. Justice (now Chief Justice) Prager, writing for the court, said:

"We have concluded from a study of the legislative history of the medical malpractice legislation enacted in the 1976 session that the amendments to K.S.A. 60-513 satisfy the requirements of the 'reasonable basis' test and that the classification distinguishing health care providers from other persons in respect to the statute of limitations bears a rational relation to the purpose of the health care legislation enacted in 1976. Stated in another way, we find there is a reasonable relation existing between the legislative objective of assuring continued quality health care in this state and the amendment of K.S.A. 60-513 to shorten the statute of limitations to four years for tort actions brought against health care providers. K.S.A. 60-513, as amended in 1976, does not violate equal protection guarantees.

"The 1976 amendment to K.S.A. 60-513 was the legislature's attempt to assure continued quality health care for Kansans by combating the rapidly rising cost of medical malpractice insurance and the increasing reluctance of insurance underwriters to underwrite medical professionals. One of the principal causes of the increased costs and unavailability of medical malpractice insurance was attributed to the 'long tail,' or the length of time after the negligent conduct, allowed for the discovery of the injury and the filing of suit thereon. Medical malpractice insurance policies insure against liability arising from conduct while the policy is in effect. Because of the 'long tail,' or ten-year discovery period, under the prior statute, premiums were being calculated to include the possibility of claims on policies in effect up to ten years earlier. With the increased number of medical malpractice claims being filed, underwriting malpractice policies became unprofitable, with underwriters leaving the medical malpractice market. As a result, it was feared that doctors would be unable to procure insurance, or would be unwilling to pay exorbitant premiums, and would leave to practice outside of this state. Reduction of the discovery period was considered to be the obvious compromise to assure continued availability of malpractice insurance while protecting the injured parties' causes of action. The public interest in solving the medical malpractice problem is discussed in depth in *State ex rel. Schneider v. Liggett*, 223 Kan. 610. *That discussion shows clearly that there is a reasonable basis for dealing with malpractice actions against health care providers in a different manner than in cases involving other tortfeasors.*" 230 Kan. at 130-31. (Emphasis added.)

It would seem obvious that if a statute, based upon the same classifications now before the court, which totally eliminates a person's cause of action and remedy is constitutional, then 60-3403 is also constitutional.

It is interesting to note that the principal opinion attempts to distinguish *Stephens* upon the basis that, being a statute of limitations case, it did not limit the recovery and then relies upon *Kenyon v. Hammer*, 142 Ariz. 69, 84, 688 P.2d 961 (1984), a shortened statute of limitations case, for the proposition that 60-3403 is unconstitutional. The attempts to discredit the legis-

lative objectives of the statute, in view of our prior cases, are not persuasive, in my opinion.

It has long been recognized that the test of equal protection and due process of law under the Kansas Constitution is the same as that under the United States Constitution. *Henry v. Bauder*, 213 Kan. 751, 752-53, 518 P.2d 362 (1974); *Tri-State Hotel Co. v. Londerholm*, 195 Kan. 748, 759, 408 P.2d 877 (1965). The principal opinion, however, without any citation of authority, baldly states, "[T]he Kansas Constitution affords separate, adequate, and greater rights than the federal Constitution," and then goes on to apply "a higher level of scrutiny" than the rational basis test. It appears to be the position of the principal opinion that some "higher standard of review" is required because medical malpractice claimants are comparable to the traditional "suspect" classifications of minorities, women, illegitimates, and aliens as recognized in various decisions of the United States Supreme Court. Thus, the opinion advocates that this " 'court must be sensitive to its institutional role as a counter-majoritarian monitor of legislative legitimacy,' " whatever that may mean. I must confess I do not know. The instant case does not involve a "suspect" classification of individuals nor does it involve such an impairment of rights that the equal protection afforded by Section 1 of the Kansas Bill of Rights is violated. What 60-3403 does do is nothing more than change a procedural rule of evidence. In *Allman v. Holleman*, 233 Kan. 781, 789, 667 P.2d 296 (1983), a case in which the court recognized the validity of the collateral source rule, Justice Herd, the author of the principal opinion herein, stated: "As the definition illustrates, the collateral source rule is merely a species of the relevancy doctrine." That is, it is nothing more than a procedural rule of evidence, does not bar a person's remedy by due course of law, and does not violate equal protection of the law.

A similar challenge to that presented in the case at bar appeared in *Eastin v. Broomfield*, 116 Ariz. 576, 570 P.2d 744 (1977), where the court had before it a statute similar to 60-3403. Art. II, § 31 of the Arizona Constitution prohibited enactment of laws "limiting the amount of damages to be recovered for causing the death or injury of any person," and Art. XVIII, § 6 provided that "[t]he right of action to recover damages for inju-

ries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation." Obviously, the Arizona constitutional provisions are far more restrictive than those of the Kansas Bill of Rights. The petitioners in *Eastin* claimed abrogation of the collateral source rule in medical malpractice actions violated these constitutional prohibitions. The Arizona Supreme Court, in a unanimous decision, rejected these arguments, stating:

"The purpose of this rule is to inform the factfinder of the true extent of the plaintiff's economic loss in order to avoid the inequity of windfall recoveries. The resulting judgments will no doubt reflect a setoff for the benefits the plaintiff has already received and these lower judgments would be reflected in lower malpractice insurance premiums, one of the objectives of the legislation. It should be noted that admission into evidence of plaintiffs' collateral benefits in no way guarantees any reduction in the damages awarded by the trier of fact. The jury may still choose to ignore the collateral benefits in making its decision as to the damages sustained by the plaintiffs." 116 Ariz. at 585.

It was also asserted that the statute violated the constitutional rights to equal protection and due process of law. The court found no merit to these contentions, stating:

"Abolition of the collateral source rule does not deprive the medical malpractice claimant of any property interest accorded protection by the due process clause of the United States Constitution. Nor is the application of the rule only to malpractice actions so arbitrary and unreasonable as to deny to medical malpractice claimants equal protection of the laws. The rule was intended by the legislature to give the jury the true extent of damages sustained by the plaintiff thereby. By scaling down the size of jury verdicts by the amount of collateral benefits the plaintiff may have received, the legislature could reasonably assume that a reduction in premiums would follow. This was one of the reasons for the Act. The legislature is entitled to proceed 'one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.' *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S. Ct. 461, 465, 99 L. Ed. 563, 573 (1955)." 116 Ariz. at 585.

In *Manzanares v. Bell*, 214 Kan. 589, 599, 522 P.2d 1291 (1974), the court, in discussing a Section 18 challenge to the No-Fault Insurance Act, stated:

"The No-Fault Act before this court does not totally abolish the common-law right to damages for personal injury; nor does it abolish the right to recovery for actual economic loss. It does provide a limitation on the right to recover non-pecuniary losses for pain, suffering, mental anguish and inconvenience. The Act prospectively modifies the common-law tort liability concept, and in no manner retroactively affects accrued common-law rights of redress. There is a

plethora of authority that '[N]o person has a vested interest in any rule of law, entitling him to insist that it shall remain unchanged for his benefit.' [Citation omitted.] Accordingly, a 'citizen may find that events occurring after passage of such a statute place him in a different position legally from that which he would have occupied had they occurred before passage of the statute.' " 214 Kan. at 599.

The rationale in *Manzanares* is equally applicable to equal protection attacks upon legislative enactments. No class of individuals has a common-law or vested constitutional right in any particular rule of court procedure. K.S.A. 1986 Supp. 60-3403 merely alters a procedural rule of evidence as recognized by this court in *Allman v. Holleman*, 233 Kan. 781. The statute does not create a suspect class which is entitled to some vague heightened scrutiny test when considering whether it violates the equal protection guarantees of the Kansas Bill of Rights.

If it can be said that a procedural rule of evidence affects a constitutional right, which subjects the rule to heightened or strict scrutiny, then every rule of procedure and evidence must be subject to the same test. Obviously that cannot be the law. Even the concurring opinion of Justice Lockett correctly recognizes that heightened scrutiny is not the proper test.

As pointed out in the principal opinion, 60-3403 has been considered by at least four different federal district court judges in Kansas. They have split two and two in their attempts to determine the proper test to be applied to the statute and whether the statute is constitutional. After reviewing the Kansas federal district court cases which had considered 60-3403 and its predecessor, K.S.A. 60-471, Chief Judge O'Connor, in *Ferguson v. Garmon*, 643 F. Supp. 335 (D. Kan. 1986), recognized the obvious split of opinion among the judges of his court and stated:

"To this dissonance, we must add our voice. Unfortunately, our conclusion will not resolve the disharmony. With all due respect to Judges Theis and Saffels, we believe that, under the law, we must employ the rational basis test.

"Our conclusion is based in large part on the unanimity with which the courts of appeals have applied the rational basis test to uphold all sorts of statutes that treat medical malpractice plaintiffs differently than other tort plaintiffs. The Second, Fourth, Fifth, Eighth, Ninth, and, significantly, the Tenth Circuits have all agreed that the rational basis test applies to statutes that draw such a classification. *See Gronne v. Abrams*, 793 F.2d 74 (2d Cir. 1986) (applying the rational basis test to uphold a New York statute that requires pre-trial screening of medical malpractice claims); *Montagino v. Canale*, 792 F.2d 554 (5th Cir. 1986) (applying the rational basis test to uphold a Louisiana statute that sets a

lower statute of limitations for medical malpractice claims); *Hoffman v. United States,* 767 F.2d 1431 (9th Cir. 1985) (applying the rational basis test to uphold a California statute that limits noneconomic losses in medical malpractice actions to $250,000.00); *Brubaker v. Cavanaugh,* 741 F.2d 318 (10th Cir. 1984) (applying the rational basis test to uphold a Kansas statute that sets a lower statute of limitations for medical malpractice claims); *Jewson v. Mayo Clinic,* 691 F.2d 405 (8th Cir. 1982) (applying the rational basis test to uphold a Minnesota statute that sets a lower statute of limitations for medical malpractice claims); *DiAntonio v. Northampton-Accomack Memorial Hospital,* 628 F.2d 287 (4th Cir. 1980) (applying the rational basis test to uphold a Virginia statute that provides for pre-trial screening of medical malpractice claims).

"We are, of course, particularly guided by the Tenth Circuit's decision in *Brubaker.* As we just noted, the court there applied the rational basis test, without hesitation, to a Kansas statute that provides a shorter statute of limitations for actions against health care providers than against other tortfeasors. 741 F.2d 318. Surely, if a statute that shortens the time within which a plaintiff must sue to avoid losing his entire claim need only meet minimal scrutiny, a statute that merely allows evidence of collateral source payments to be considered by a jury faces no more exacting standard.

"Judge Theis, in *Coburn,* recognized that the courts of appeals have made their views clear. Nonetheless, he dismissed those cases as being 'unhelpful' and of 'scant assistance' because 'they applied the mere rational basis test without any consideration of whether heightened scrutiny was required.' 627 F. Supp. at 992. Although we perhaps agree with Judge Theis that the Supreme Court has, on recent occasions, applied the rational basis test more stringently than it has done so traditionally, *(see, e.g., City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985), the Court has expressly denied that it was blurring the tripartite level of review under equal protection law. [Citations omitted.] Moreover, we deem it significant that the courts of appeals have refused to discuss, much less recognize, the heightened form of rational basis test enunciated in *Coburn.*

"Finally, we note that in 1985 the Supreme Court summarily dismissed a relevant decision by the California Supreme Court in *Fein v. Permanente Medical Group,* 38 Cal. 3d 137, 695 P.2d 665, 211 Cal. Rptr. 368, appeal dismissed 474 U.S. 892, 106 S. Ct. 214, 88 L. Ed. 2d 215 (1985). In *Fein,* the state supreme court used the national basis test in determining that the California statute, which limits recovery of noneconomic damages and allows health care providers to introduce evidence of collateral source payments, is constitutional. The United States Supreme Court dismissed the appeal for want of a substantial federal question. 106 S. Ct. 214.

"Admittedly, the Supreme Court's summary dismissal did not explicitly address which level of review is appropriate. Nonetheless, the Court's decision was a ruling, on the merits, *(see Hicks v. Miranda,* 422 U.S. 332, 344, 95 S. Ct. 2281, 2289, 45 L. Ed. 2d 223 (1975)), that the plaintiff's equal protection argument did not pose a substantial federal question. The Court has warned that 'inferior

federal courts had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise.' *Hicks*, 422 U.S. at 344, 95 S.Ct. at 2289 (quoting *Port Authority Bond Holders Protective Committee v. Port of New York Authority*, 387 F.2d 259, 263 n.3 (1967)). Because there have been no doctrinal developments in the interim, and because we are unpersuaded by Judge Theis' attempt to distinguish *Fein*, we conclude that medical malpractice classifications warrant minimal scrutiny and thus that the court need only assure itself that such classifications are rationally related to a legitimate state purpose." 643 F. Supp. at 339-40.

I also note that, in the cases now on appeal, and in the various cases from the Kansas federal district courts, none of the numerous judges who have considered the constitutionality of 60-3403 have applied the traditional strict scrutiny or heightened scrutiny tests. The principal opinion is incorrect in doing so now. Section 1 of the Kansas Bill of Rights does not require that 60-3403 be subjected to strict scrutiny or even to some new form of heightened scrutiny not recognized by any appellate court.

Turning briefly to the concurring opinion of Justice Lockett, I agree with him that the rational basis test is proper and that the principal opinion is incorrect in asserting the so-called "heightened scrutiny" test. I also agree that the legislature could abolish the collateral source rule, being merely a rule of evidence, in all tort cases and that 60-3403 might be difficult to apply. I do not agree that departure from our earlier decisions in which we have recognized the legitimate objective of the legislature is proper in this case. That bridge was crossed long ago and nothing has occurred to change our prior determinations.

It is my opinion that the rational basis test is the proper test to apply in determining whether 60-3403 is unconstitutional as a violation of both due process and equal protection of the laws under both the Kansas and federal Constitutions. I am also of the opinion that the statute bears a reasonable relation to the appropriate legislative objectives sought and therefore is not unconstitutional as a violation of the guarantees of either the Kansas Bill of Rights or the United States Constitution.

MILLER and McFARLAND, JJ., join the foregoing dissenting opinion.